# CHARLESTON.

WHITE v. COOK.

Submitted January 21, 1902.    Decided March 22, 1902.

1. OFFICE FARMING—*Sheriff—Deputy—Contract.*

   A contract between a sheriff and his deputy, providing that the deputy shall collect all the taxes, with slight exceptions, and do all the work of the sheriff's office in one district and attend the sessions of the court during stated portions of the time each year, and is to have all the fees and commissions allowed by law upon the work done by him, and is to pay the sheriff one hundred dollars a year, the agreement violates section 5 of chapter 7 of the Code, prohibiting the sale or farming, in whole or in part, of any office under the laws of this State. (p. 203).

2. OFFICE FARMING—*Contract—Sum to Be Paid.*

   When such contract provides that the payment of the sum agreed to be paid by the deputy shall be paid out of the fees and commissions, it is not in violation of said statute, but when the contract provides for the payment of such sum without specifying that it shall be paid out of the fees and commissions, it is a contract to pay at all events and amounts in law to a purchase of the office in part and is, therefore, illegal. (p. 204).

3. DEPUTY SHERIFF'S BOND—*Rights of Sheriff.*

   A bond given by a deputy, conditioned for the faithful performance of his duties as deputy sheriff, and containing in one of its clauses a reference to said contract, is void as to the private interest of the sheriff and his deputy, so far as it may relate to them, and no recovery can be had thereon for any fees or commissions or the sum specified in said contract to be paid by the deputy. (p. 207).

4. SHERIFF'S RIGHT AGAINST DEPUTY—*De facto Officer.*

But the sheriff may recover thereon the taxes, fines, other public dues and money received by the deputy on executions and other process, although he may have satisfied the State, county, district and creditors as to such fund and such recovery only operates to reimburse him; for these funds came into the hands of the deputy as a *de facto* officer, by virtue of the law as much as by reason of the contract, and primarily belong to the public and innocent private individuals, and said statute is not allowed to so operate as to imperil the interests of the public or innocent persons.   (p. 215).

5. PUBLIC FUNDS—*Public Policy—Illegal ·Contract.*

Public policy demands protection of public funds in the hands of *de facto* officers as well as prohibits the sale or farming of public offices, and although ordinarily where a contract grows immediately out of, or is connected with, a contemporaneous or prior illegal contract, the, illegality of such contract enters into contemporaneous or subsequent. contract and vitiates it, from considerations of public policy, that rule is not applicable when the illegal part of the contract can be severed from the balance of it and it is necessary to do so to protect funds which, in their nature and primarily, belong to the public and persons unconnected with the illegal contract.   (p. 216).

6. SHERIFF'S SUIT AGAINST DEPUTY—*Declaration.*

A sheriff cannot maintain a bill in equity for an account against his deputy without showing, by sufficient allegatons, special circumstances entitling him to discovery as necessary to complete and adequate relief, or that the accounts are complicated and intricate.   (p. 217).

Appeal from Circuit Court, Mercer County.

Bill by E. E. White, as admisistrator, against Thomas B. Cook and others.   From the decree, plaintiff appeals.

*Affirmed.*

J. W. HALE, for appellant.

A. M. SUTTON and C. W. SMITH, for appellees.

POFFENBARGER, JUDGE:

James A. White was elected sheriff of Mercer County in 1896, and, in January, 1897, with the consent of the county court of said county, he appointed T. B. Cook his deputy.   The contract of service made between them is dated January 1, 1897, and, after reciting the election and qualification of the sheriff and appointment of the deputy, it reads as follows:

"Now, therefore, this agreement, Witnesseth, That the party of the second part, agrees to do and perform all the work to be done by the sheriff of Mercer County as the law requires, in the District of Rock of said county; to attend upon the sessions of the courts of said county his proportional part of the time, but in no event to exceed one-third of the time of said courts, and to pay to said party of the first part one hundred ($100) dollars per annum. The party of the first part reserves, however, in the collection of the taxes of said Rock district, the tax ticket against .E. W .Clark, et al., trustees. The party of the first part agrees that the party of the second part shall have all the fees and commissions arising from all work and labor so performed by him in and about his duties as such deputy sheriff of Mercer County in the said District of Rock, except the commissions of the said tax ticket of E. W. Clark, et al., trustees, reserved as aforesaid. But in no event is the said party of the second part to have or receive any commissions on any sums not collected by him."

The sheriff took a bond from said deputy in the penalty of twenty-five thousand dollars and with numerous sureties. The condition of the bond reads as follows:

"The condition of the above obligation is such, that, whereas, the said James A. White was duly elected sheriff of Mercer County, West Virginia, on the 3rd day of November, 1896, whose term of office begins on the first day of January, 1897, and, whereas, said White with the consent of the county court of said county entered of record has appointed the above bound T. B. Cook deputy sheriff for said county within Rock district said county who is to perform such duties within said district and receive such compensation and reward as is set forth in a written contract this day executed by and between said White and said Cook and which is made a part hereof:

Now, therefore, if the said T. B. Cook shall well and truly perform his duties as such deputy sheriff within said Rock district and perform such work in court as set forth as above mentioned, then this obligation to be void, otherwise to remain in full force and virtue."

White died in September, 1900, and Cook served as deputy until after the date of the death of White, but just how long does not appear. Taxes and other demands amounting to a large sum of money went into his hands for the years 1897, 1898 and 1899, and no final settlement has been made between him

and the administrator of White. In the year 1900, E. E. White, as administrator with the will annexed of James A. White, deceased, instituted a suit in equity against Cook and all his sureties on the bond, alleging that the accounts between said decedent and the defendant Cook were mutual, that Cook was indebted to the estate of White on account of his deputyship in the sum of seven thousand five hundred dollars and that discovery on the part of Cook was necessary to complete and adequate relief. The circuit court sustained a demurrer to the bill, being of the opinion that the bond and contract exhibited therewith, were made in violation of the statute and public policy of the State and are void. Leave was granted the plaintiff to amend his bill and, after the amended bill had been filed, the court sustained a demurrer to it on the same ground and dismissed it. The amendment consisted of an allegation that there was a sort of ante-election agreement between said sheriff and the voters of said Rock district that, in case of the election of White to the office of sheriff, he would appoint Cook deputy for that district and that, in pursuance of such understanding, Cook was appointed.

It is insisted here, as it was in the court below, that the contract between White and Cook amounted to a sale, or farming, of a part of the office of sheriff. Undoubtedly, this contract falls within the exact terms used in *Godolphin* v. *Tudor,* 2 Salk. 468, decided under the reign of Queen Anne, which is everywhere considered the leading case on the subject. On a writ of error to the House of Lords the judgment was affirmed. 1 Bro. Pc. Cas. 135. In the report of the case found in Salk. it is said "The court held, that where an office is within the statute, and the salary is certain, if the principal make a deputation, reserving a lesser sum out of the salary, it is good: So if the profits be uncertain, arising from fees, if the principal make a deputation, reserving a sum certain out of the fees and profits of the office, it is good; for in these cases the deputy is not to pay unless the profits rise to so much; and though a deputy by his constitution is in place of his principal, yet he has no right to the fees, they still continue to be the principal's; so that as to him, it is only reserving a part of his own, and giving away the rest to another; but where the reservation or agreement is not to pay out of the profits, but to pay generally a certain sum, it must be paid at all events, and such bond is void by the stat-

utc." The statute referred to is 5 and 6 Edw. ch. 16. Godol-phin, being the auditor of Wales, made Tudor his deputy and they entered into an agreement by which the deputy was to have all the fees and, in consideration thereof, pay his principal two hundred pounds per annum and save him harmless. In *Greville* v. *Atkins,* 9 Barn. & Cres. 462, the same conclusion is reached under the statute, 49 George III, ch. 126. Other English cases bearing on the subject of sales of offices are *Parsons* v. *Thompson,* 1 H. B. L. 322; *Garforth* v. *Fearon,* 1 H. B. L. 327; *Lockner* v. *Strode,* 2 Chy. Cas. 48, as explained by Lord Loughborough in *Garforth* v. *Fearon; Juxton* v. *Morris,* 2 Chy. Cas. 42; *Blachford* v. *Preston,* 8 Durn. & East, 89; *Haneington* v. *DuChattel,* 1 Bro. Chy. Cas. 124. A careful examination of these cases leads to the conclusion that the whole doctrine of the English law concerning sales of offices and deputations is based upon the statute, 5 and 6 Edw. VI, ch. 16, and other statutes which forbid and make illegal the sales of certain offices. There is no clear intimation that by the English common law the sale of an office or deputation was illegal. Lord Kenyon said in *Blachford* v. *Preston,* "Up to a certain extent the legislature have interfered and prohibited by statute 5 and 6 Edw. VI, the sale of some of the offices; but whether or not that act of parliament were necessary for the purpose I will not now inquire." In *Garforth* v. *Fearon,* in which the customer of a port, having before his appointment agreed to hold the office in trust for another party and appoint such deputies as the other party should nominate and would empower said other party to receive the profits of the office to his own use, an action of *assumpsit* was brought on the agreement The contract was held to be void and Lord Loughborough said: "I should therefore not find much difficulty to conclude, if there were nothing more in the case, that the common law would not support an *assumpsit* on such an agreement. But I think it is clearly void by positive law respecting this office. The appointment of any customer by any means contrary to the statute 12 Ri. II, ch. 2, is a misdemeanor. That statute, though very ancient, is certainly not obsolete; it is the statute under which they are sworn in the Exchequer. It not only prohibits the appointment, but goes on to say that 'none that pursueth by him or by others, privily or openly to be in any manner of office shall be put in the same office or in any other,' and the 5 and 6 Ew. VI, ch. 16, makes

void all promises, bonds and assurances, as well on the part of the bargainer, as the bargainee."

The English rule is generally recognized and applied by the American courts. Throop on Pub. Officers, s. 579; 9 Am. & Eng. Ency. Law, (2d Ed.) 376. In Georgia, Kentucky, North Carolina, New Hampshire and Virginia the courts have applied the English statute 5 and 6 Edw. VI, ch. 16, and the doctrine of the English courts. *Grant* v. *McLester*, 8 Ga. 553; *Outen* v. *Rodes*, 3 A. K. Marsh. (Ky.) 433; *Love* v. *Buckner*, 4 Bibb. (Ky.) 506; *Davis* v. *Hull*, 1 Litt. (Ky.) 9; 2 J. J. Marsh, (Ky.) 8; *Noel* v. *Fisher*, 3 Hall 185 (216); *Meredith* v. *Ladd*, 2 N. H. 517; *Carleton* v. *Whitcher*, 5 N. H. 196; *Cardigan* v. *Page*, 6 N. H. 182; *Haralson* v. *Dickens*, 4 N. C. ———. In other states statutes have been passed founded upon that of 5 and 6 Edw. VI, ch. 16, notably, New York, Virginia and Wisconsin. *Becker* v. *Ten Eyck*, 6 Paige, (N. Y.) 68; *Tappen* v. *Brown*, 9 Wend. 175; *Mott* v. *Robbins*, 1 Hill 21; *Adington* v. *Sexton*, 17 Wis. 327; *Salling* v. *McKinney*, 1 Leigh 42; *O'Rear* v. *Kiger*, 10 Leigh 653; Code of Va. (1819) 559, ch. 145; Rev. Rep. ch. 12.

The tenacity with which the courts adhere to the English rule where they recognize the English statute and it has not been modified, in any way, will be seen by reference to some of the cases cited. In *Grant* v. *McLester*, the clerk of an inferior court appointed a deputy, agreeing to give him for compensation all the fees and costs already accrued and which were thereafter to accrue, and the deputy agreed to pay his principal five hundred dollars out of the fees and costs thereafter to accrue and gave his notes to secure the payment of the same. The court held that it was an agreement to pay the five hundred dollars at all events and was not limited to payment out of the fees and was therefore void. In *Ferris* v. *Adams,* 23 Vt. 136, the action was upon a note for thirty dollars given by a deputy sheriff to his principal upon the occasion of his being appointed to the office and the court held the contract void, basing its decision upon the English cases and many of the American cases here cited. In *Noel* v. *Fisher*, 3 Call 185, the action was debt upon a bond given by a deputy sheriff, in the condition of which it is recited that, for the perquisites and benefits of the office, the deputy agrees and binds himself to pay the sum of thirty-five

pounds on specified days and the court held that the contract was void under the British statute of Edw. VI.

The contract between White and Cook, in so far as it relates to the amount which Cook agreed to pay White, is clearly within the principles of law against the farming of offices. But the principal question in the case is, whether the action may be maintained upon the bond for the recovery of the taxes and other moneys which went into the hands of Cook by virtue of his deputyship. It is insisted here that the contract of appointment to the office of deputy being illegal and void, all contracts and transactions in pursuance and furtherance thereof, are void. This contention is borne out by some of the American cases. No English case is recalled in which that question arose. They were all actions or suits differing very materially in their facts and legal status of the parties from this case. In *Lewis* v. *Knox,* 2 Bibb. (Ky.) 453, the court held that the bond taken for a sum given for the sale and purchase of an office is void, but whether it was intended to hold in that case, that the bond was void for all purposes or only as to the illegal consideration, does not appear. In the opinion it is said, "So far as the condition of the bond is to perform the duties of the office of sheriff and keep the principal indemnified, there is clearly nothing in it illegal. For as the sheriff may lawfully appoint a deputy, it would be unreasonable not to permit him to take security for his indemnity against any violation of the duties of the office by the deputy." But, in *Love* v. *Buckner,* 4 Bibb. (Ky.) 506, the court met the point squarely and decided that the bond was invalid for any purpose and in all respects, the court said "The bond we suppose not to be of the character of those declared void by the statute, 5 and 6 Edw., ch. 16. That statute more properly applies to bonds securing the payment of anything agreed to be given for an office, and should not be construed to embrace bonds conditioned exclusively for a faithful discharge of the duties of an office. But although there is no stipulation in the bond repugnant to the provisions of the statute, yet as by a recitation in the condition, the deputation of the office appears to have been sold by Love to Buckner, it becomes material to inquire whether upon common law principles, the bond can be sustained. The sale of the deputation must have caused the execution of the bond; and as the sale is expressly interdicted by the statute, the consideration of the bond is against law, and

consequently the bond itself inoperative." In *Davis* v. *Hull,* 1 Litt. (Ky.) 10, the action was on the bond of a deputy sheriff for breaches of its condition for the faithful performance of the duties of the deputy, and a plea was interposed, alleging that Davis, the sheriff, on the day of the date of the bond, sold the deputation of the office to Hull for the sum of —————— dollars, and it was held that the facts alleged in the plea formed a valid bar to the plaintiff's action on the bond. Another case which goes probably further than any of these is *Cansler* v. *Penland,* 125 N. C. 578, decided in December, 1899. There, the sheriff, being the tax collector of the county, made a contract with another person by which it was agreed that the latter should collect the taxes for the years 1891 and 1892 and receive a commission of two and one-half percent for making the collections. The tax list was delivered to him and he collected the taxes and, in 1894, the sheriff brought an action against him and recovered a judgment for ninety-three dollars and two cents. On appeal the judgment was reversed on the ground that the contract was illegal. A circumstance which distinguishes this case from all the Kentucky cases is that the party who was employed to collect the taxes and to whom the sheriff endeavored to delegate his authority in that respect, does not appear to have been appointed a deputy. However, the decision does not seem to rest upon that circumstance. The court regarded it as an unauthorized delegation of authority, amounting to a farming out of the office. Redfield, Judge, in *Ferris* v. *Adams,* refers to the Kentucky case of *Love* v. *Buckner,* in which the court held the bond, given to indemnify the sheriff, void and says: "We should not perhaps be prepared to go to that length." There is no Virginia case in which the bond given by a deputy, conditioned for the faithful performance of his duties and to indemnify the sheriff, has been held invalid, as to the indemnity, on the ground of a sale of the deputation. On the contrary, in *Salling* v. *McKinney,* 1 Leigh 42, the court virtually repudiated the English doctrine, in so far as it relates to sales of deputation in the office of sheriff. That was the first case involving the question of the sale of a deputation, in which the purpose of the action was to recover for breaches of the condition to faithfully perform the duties of the office and indemnify the sheriff against loss. *Hoge* v. *Trigg,* 4 Munf. 150, was an action, by a deputy sheriff against his principal for damages, on the contract

between them for removing the plaintiff from his office in violation thereof. *Noel* v. *Fisher* was for the recovery of the purchase money of the deputation. *O'Rear* v. *Kiger* was an action brought by Kiger against O'Rear's administrator for the breach of an agreement by O'Rear, in consideration of money, to appoint Kiger his deputy. In *Hoge* v. *Trigg*, the declaration showed that Hoge, by their agreement, was to pay Trigg for the fees and profits of his office one hundred dollars. Several pleas in bar were interposed and among others that Hoge had been guilty of certain misfeasances and improprieties in office, which was held to be a bar to his action. On a writ of error to this judgment it was affirmed. The supreme court of appeals waived the question whether the contract was void because of the agreement to pay the sheriff a certain sum of money for the fees and profits of the office. This case was decided twelve years later than that of *Noel* v. *Fisher*.

*Salling* v. *McKinney,* 1 Leigh 42, arose after the passage of the Virginia statute found in 1 Rev. Code, 1819, taken from the British statute of Edw. VI, and it was held that the sale of deputation of a sheriff's office was not within the inhibition of that statute. That statute provided in section 3 that "Every such bargain, sale, promise, bond, covenant, agreement and assurance, as before specified, shall be utterly void and of no effect," but it also contained in the 4th section this proviso, "Provided always, that nothing in this act contained, shall be so construed as to prohibit the appointment, qualification, and acting of any deputy clerk, or deputy sheriff, who shall be employed to assist their principals in the execution of their respective offices." Judge Carr said, in his dissenting opinion, that this proviso did not so operate as to take the sale of a deputation in the office out of the statute. But Green, Judge, and Brook, President, while admitting that such sale was clearly within the terms of the first section of the act, held that the proviso did so operate. The former said, after discussing the statute, "These considerations would incline me strongly to the opinion, if we were not to look beyond the terms of the statute itself, that the sale of the deputation of the offices of clerk and sheriff, was not embraced by the statute. Other circumstances lead to the same conclusion." The principal one of these considerations was stated as follows: "The only case in which a deputation of the office could come within the enacting clause,

is that where the deputy paid or agreed to pay for it, a gross sum, at all events, and independently of the amount of the fees: and if the proviso does not except such a case, it has no effect whatever." He then reviews the history of the sheriff's office in Virginia and, among other things, says: "The office of sheriff, devolving on them (the justices) in succession, generally comes to them at an advanced age, and when they are unfitted, from that cause, as well as from their previous course of life, and other occupations, to discharge in detail the duties of the office, or even to superintend personally the discharge of those duties by others; and they have, as was to be expected, almost invariably, so far as I am informed, and as indeed is perfectly notorious, farmed their offices to others, without being conscious of violating any law, either municipal or moral. This practice must have been well known to the legislature, which enacted the law in question. And this induces a belief, that the proviso was intended to except the deputation of this office from the general terms of the statute." The reasoning of Brook, President, was much the same. The law as settled by this case so remained until 1849, when the revisors recommended that the office of deputy sheriff be expressly excepted from the statute prohibiting sales of offices and deputations thereof, saying: "More than one hundred years ago when a deputy sheriff who had given bond to the high sheriff, to indemnify him and pay him one thousand five hundred pounds of tobacco, pleaded the statute of 5 and 6 Edw. VI, and averred the tobacco to be for the deputation, the plea was adjudged in Virginia to be bad. *Goodlow* v. *Dudley,* Jef. Rep. 59. And more recently the practice which prevails in Virginia of farming the sheriffalty was sanctioned in *Salling* v. *McKinney,* 1 Leigh 42. This being the case, it is deemed better to make the statute conform to the practice and the adjudications sanctioning that practice, than to retain merely the language of the 4th section of the act in 1 R. C. p. 559." Rev. Rep. p. 49. It will be seen by reference to the Code of 1860, chapter 5, section 6, that, in pursuance of this recommendation, the office of deputy sheriff was expressly excepted from the general statute, section 5 of same chapter, against selling or farming of the offices or deputations thereof. This exception became a part of the law of this state and so remained until 1868 when said section was stricken out and section 5 amended so as to read as follows: "If any person

holding -or expecting to hold any office under the laws of this
state, sell the same, or let it to farm, either in whole or in part,
or contract to do so, such person and the person who may buy,
take to farm, or contract to do so, shall be thereby disabled from
holding said office." Our present statute on the subject is in
the same terms, and it is worthy of notice that it is a substantial
modification of section 5 of chapter 12 of the Code of 1860 in
this, that the words, "or the deputation thereof," found in the
old statute, are omitted from our present statute. How much
weight this omission is entitled to in the construction of that
statute, it is difficult to say. But, if the process of reasoning,
adopted in *Salling* v. *McKinney,* should be applied here, it
would probably lead to the conclusion that it was the intention
of the legislature, in so doing, to except from the operation of
that section contracts relating to the compensation of deputy
sheriffs. The public policy of the state of Virginia, as shown
by its legislation and the interpretation thereof by its highest
courts carried down into the jurisprudence of this State, as has
been shown, undoubtedly warrants and commands, on the part
of this Court, in the construction of that statute, a relaxation, in
respect to contracts between a sheriff and his deputy, of the
strictness of the English rule as enforced by the courts of Ken-
tucky and North Carolina. Even in Kentucky, when the Eng-
lish rule was enforced to the very letter, as has been shown, in
more than one case and carried perhaps even beyond any Eng-
lish precedent, public sentiment blotted it out about the same
time it was abrogated in Virginia, as will be seen from an ex-
amination of the case of *Baldwin* v. *Bridges,* 2 J. J. Marsh. 7,
where it is said: "This opinion of the impolicy and injustice of
invalidating the bonds of deputies for indemnifying their prin-
cipals, is fortified by public sentiment. An act of 1820, 2 Dig.
1146, declares that such bonds shall be obligatory, even when
executed in consideration of sale to the deputy." Our statute
no longer provides, as did the statute of Edw. 5 and 6 and the
early Virginia statute, both of which have been supplanted by
it and are not now law in this State, that every bond, covenant,
agreement and assurance for any vote or appointment to office
shall be utterly void, and this provision undoubtedly had great
weight in the construction put upon those statutes by the courts.
They further provided that persons guilty of making such con-
tracts should be forever disabled from holding such posts or

deputation. That, also, has been eliminated from our statute which says only that they "shall be thereby disabled from holding said office," which language has been construed by this Court in *Dryden* v. *Swinburne,* 20 W. Va. 89, to mean that they shall be disabled only from holding the particular term of the office in respect to which the illegal contract was made.

Where an officer has the right, under the law, to appoint a deputy and is at liberty to contract with his deputy, in respect to compensation, as a sheriff may do in this State, the reason for the distinction between the effect of a contract by which the deputy is to have all the fees and perquisites of the office and pay his principal a sum certain out of the fees, and a contract by which he is to pay a sum certain, without limiting it to payment out of the fees, is not in all respects satisfactory, although that distinction is hoary with age and too well settled to be disturbed. With us, in the selection of deputy sheriffs, the law is so lax as not to require the application of the principle *detur digniori.* The sheriff has full latitude to select, not the most meritorious and competent man to perform the duties of deputy sheriff, but the man who will perform that duty for the least money, subject only to the limitation that the county court must consent to the appointment. He may permit his deputy to take all the fees and commissions for his services and, in consideration thereof, pay to his principal any amount of money they may see fit to agree upon, provided only that it be specified that the money so to be payable shall be paid out of the fees and commissions. If the only object of the law is to prevent trafficking and dealing between the sheriff and his deputy in respect to his compensation, whereby the deputy may take his appointment for such meagre compensation as to make it necessary for him to oppress the people and extort from them what he is not legally entitled to, it clearly falls far short of accomplishing that purpose. It is difficult to conceive of any circumstances under which a man would engage to perform the services of a deputy sheriff and take upon himself great financial responsibility and risk, in consideration of the fees and commissions, and, at the same time, agree, in consideration of the premises, to pay his principal more money than he could reasonably expect to realize out of the fees and commissions. The law, as settled and as applied for centuries, stands upon an assumption of facts which it is difficult to imagine ever existed in any case. With

all due respect to the learned and illustrious men, who laid its foundations, it must be said that the distinction seems to be more technical and fictitious than real. Taking the contract between the parties in this case as a whole, holding it up by its four corners, it imports nothing more than an agreement between the sheriff and his deputy whereby the latter undertakes to perform all the services of the sheriff in a certain district except the collection of a certain tax ticket, for all the fees and commissions arising from the work, except one hundred dollars which he agrees to pay to the former, had they said the deputy should have all the fees and commissions less the sum of one hundred dollars, the contract would be good under the authority of all the cases cited. However, as has been said, the law is too well established to be overthrown, however devoid of sound reason it may appear to be. From this it results that no recovery can be had upon the bond or otherwise for the money which the deputy agreed to pay his principal.

But it does not follow that the plaintiff is precluded from recovering the taxes, fines and other moneys which went into the hands of the deputy by virtue of his office, as was held in Kentucky and North Carolina, unless that part of the contract which is forbidden by the law is such that it cannot be severed from the other. It is argued here that the illegal contract between White and Cook, which the statute says disabled both of them from holding the office, disabled Cook from doing any official act as deputy. If so, then by the same means White was also disabled from doing any official act. But it is an admitted fact that both of them continued to perform the functions of sheriff and deputy sheriff, respectively, in their county. The state, county and district revenues, executions on judgments and decrees, fines and other dues, public and private, went into their hands. Is it possible that because the contract between them, in reference to the appointment of Cook, was such as is prohibited by the law and resulted in the forfeiture of their offices, the state, county, districts and private individuals must lose the large sums of money which went into their hands? Whether legal or illegal they held the offices. If not officers *de jure* they were officers *de facto*. Code, chapter 7, section 15. These funds that went into their hands were put there by the law and not solely by their illegal contract. If it be possible to ascertain what those funds amount to, why should they not be

separated from the illegal consideration of the appointment and a recovery thereon allowed? What difficulty stands in the way of such severance? How much of the state money, county money, district money, what fines, what collections on executions, are in the hands of Cook are easily ascertainable and they bear no relation whatever to the illegal one hundred dollars which Cook agreed to pay, except that, by reason of the agreement, Cook was enabled to obtain the position by virtue of which these funds came into his hands. It is claimed, for that reason alone, the bond of indemnity is vitiated and Cook must be allowed to escape with all the money which went into his hands except what he has seen fit to pay over. The same law which· permits the appointment of a deputy sheriff and allows the sheriff to contract with him for his compensation, requires the sheriff to give a bond for the faithful performance of his duties. To allow a deputy sheriff to squander or appropriate to his own use the public funds for which the sheriff is responsible and thereby inflict great loss upon the sureties of the sheriff himself and possibly upon the public, simply because the contract between the sheriff and his deputy, in respect to his appointment, which is clearly severable from the public duty, faithfulness in respect to which is secured by the deputy's bond, certainly was never intended by the legislature, nor is there any evidence that the law pronounces such disastrous results except the three or four cases which have been mentioned.

The principle of severance where part of a contract is illegal and can be separated from the balance, is perhaps as "rock-ribbed and ancient" as any other principal of the law.

In *Pigot's Case,* 11 Coke, 26 b—, it is said: "If some of the covenants in an indenture, or of the conditions indorsed on a bond, are against law, and some lawful, the covenants or· conditions which are against law are void *ab initio,* and the others remain good." It is there said that this was unanimously agreed in 14 Henry 8, 25, 26, etc. *Gaskel* v. *King,* 11 East 164, was decided almost one hundred years ago and it is there held that "A distinct covenant in a lease; whereby the tenant bound himself to pay the property tax, and all other taxes imposed on the premises, or on the landlord in respect thereof, though void and illegal by the stat. 46 G. 3 c. 65 s. 115 will not avoid a separate covenant in the lease for payment of rent clear of all parliamentary taxes, etc. generally; for such general words will be

understood of such taxes as the tenant might lawfully engage
to defray." *M'Allen* v. *Churchill*, 11 Moore 483, was an action
of *assumpsit* on a contract whereby the plaintiff agreed to pur-
chase the defendant's interest in a lease and pay for the fixtures
on certain terms, and it appeared on the face of the agreement
that it contained a clause whereby the defendant agreed that
he would not, directly or indirectly, take, occupy, or carry on the
business of a publican or victualler within five years from the
time of making the agreement. This clause was admittedly
illegal and against public policy, being in restraint of trade, but
Best, L. C. J., dismissed the objection by saying: "But are we
to say that every agreement is wholly bad, because it may hap-
pen to contain an illegal clause?" *Filsom* v. *Himes*, 47 Am.
Dec. 422, 5 Penn. St. 452, was an action of *assumpsit* to recover
the balance for the sale of a store and its contents. But it ap-
peared from the plaintiff's testimony that he sold the store for
a certain amount and in consideration of the defendant's
promise to procure the removal of a post-office to the plaintiff's
place of business, and that he should be appointed postmaster.
There was judgment for the defendant in the lower court. The
question principally discussed in the appellate court was whether
the procurement of the post-office should be severed from the
rest of the consideration, the court holding that if that were
possible the plaintiff should be permitted to recover. In de-
termining whether the illegal part of the contract should be
separated from the balance of it, Gibson, C. J., said: "The
value of the goods could be ascertained from the bills, but the
value of the lease could not be reduced to certainty by any pro-
cess, and even if it could, no one could say how much the want
of the post-office, to say nothing of the direct income of it, might
take from the defendant's business. Had a price been put on
the illegal part of the consideration, it might have been de-
ducted, and the contract apportioned; as it was in *Frazier* v.
*Thompson*, 2 Watts & S. 235, in which the consideration was
goods purchased at several times, including spurious bills; and
in *Yundt* v. *Roberts*, 5 Watts & S. 139, in which it was goods
sold and a prohibited tavern bill." In *Rand* v. *Mather*, 11
Cush. 1, it is held that "If part of agreement is contrary to stat-
ute, this does not avoid or annul other parts of the agreement
which are separable from the bad part, and not founded upon it,
unless the statute expressly or by necessary implication declares

the whole bad." *Page* v. *Monks,* 5 Gray 495, holds that "A contract is not necessarily void, or wholly inoperative, because it consists in part of promises and engagements for the breach or disregarding of which the statute neither affords nor allows any action at law. In such cases, whether any of those promises or engagements can be enforced must depend upon the manner and extent of their connection and combination with the rest. If the contract is in its nature entire, and its parts are incapable of separation or division, then, though some of its stipulations are not if others of them are affected by the statute, no action can be brought or maintained upon it." But it is otherwise if the parts are severable." While there are many cases which hold that where a contract grows immediately out of, and is connected with, a prior illegal contract, the illegality of such contract will enter into the new contract and render it illegal, and that if the connection between the original illegal contract and the new contract can be traced, it cannot form the basis of a recovery. 15 Am. & Eng. Ency. Law, (2d Ed.) 992. But it must be remembered that the funds which went into the hands of Cook, as deputy sheriff, although their reception by him followed the illegal contract as one of its consequences or results, were public funds. He was a *de facto* public officer and it was by virtue of the law as well as in consequence of the illegal contract that these funds came into his hands. Moreover, while technically and directly they are due to White, they are still, in some sense, public funds, and to allow the illegal contract, in reference to his appointment, to vitiate the security for these funds would, under some circumstances, as has been shown, result in the loss of public funds. So far as these funds are concerned, the contract between White and Cook may be regarded as a contract between private individuals, but it is nevertheless a contract relating to public funds, and in so far as it may effect them, it is severable from the balance of the contract and to the end that the public interest may be protected, it is necessary that it be held good as to such funds. In all the cases hereinbefore referred to in which the principle of separating the good from the bad in contracts has been discussed, the matters involved and affected were purely private in their nature. Here, the subject-matter of the contract of indemnity, which is said to be vitiated by the illegal part of the contract, is a large amount of money which does not belong to either of

the contracting parties in point of fact, but consists of public revenues and money of individuals in the custody of the law. This is a most important distinction and one which imperatively demands, as well as justifies, the separation of the good from the evil in the contract and permits a recovery of the money. While public policy forbids the sale of an office in whole or in part, it requires the protection and faithful application of the public revenues, and no statute should be so construed, as to permit or effect the loss of public funds or the funds of innocent persons in the hands of public officers, whether they be officers *de jure* or officers *de facto*. On this point, therefore, the conclusion is, that, so far as the contract and bond relate to the private interests and rights of the sheriff and his deputy, they are illegal and void and the courts cannot enforce them as to either of the parties; but, in so far as the bond relates to the moneys, public and private, which went into the hands of Cook, and which it was his duty as an officer to collect, and which were lost by his unfaithfulness or negligence, if there be any such funds, the bond is valid and recovery thereon may be had against Cook and his sureties. But such recovery will not include any commissions or fees, for they fall within, and belong to, the private interests in the office which are the subject-matter of the illegal contract. As to these matters the law will leave the parties in the situation in which they have put themselves, refusing aid to either of them.

The principles announced in the following cases seem to fully sustain this view: *Faikney* v. *Reymons,* 4 Burr. 2069; *Fariner* v. *Russell,* 1 B. & P. 269; *Brooks* v. *Marlin,* 2 Wall. 70; *Bank* v. *Bank,* 16 Wall. 483; *McBlair* v. *Gibbes,* 17 How. 232; *Bly* v. *Bank,* 79 Pa. St. 453.

Another objection to the bill is, that there is no equity in it and this objection is undoubtedly well taken. The court properly dismissed the bill but gave an insufficient reason for so doing. This bill is substantially like the one in the case of *Lafever* v. *Billmyer,* 5 W. Va. 33. Lafever was the sheriff of Berkeley County and Billmyer was his deputy for the years 1859 and 1860, and the bill showed that there had been no settlement between the sheriff and his deputy and alleged that the accounts between them were complicated and intricate as this bill does. It also prayed for discovery, as is the case here, and the court held that the accounts were not mutual and that equity had

no jurisdiction unless proper ground for discovery appeared in the allegations of the bill. JUDGE MOORE discussed that case at great length and came to the conclusion that there was no ground for discovery. The only thing in this bill that seems to suggest the necessity of discovery is the allegation that White, in his lifetime, delivered to Cook sundry orders amounting, in the aggregate, to the sum of one thousand fifty-eight dollars and twenty-five cents, which White himself had paid, and that the plaintiff does not know the amounts, numbers or character of the orders, but that Cook does know all about them, and when and under what circumstances they were delivered to him, and that he is the only person that does know. These orders seem to have been given to Cook for the purpose of making the annual settlements between White and the county court and board of education, for the bill alleges that they were used in the settlements and that it is impossible to ascertain which orders, so filed and used, are those paid and turned over by White to Cook. This is merely colorable, and no real ground for discovery, for the reason that, if these orders are credited to White in his settlement as alleged in the bill, White had received credit for them and has no right to charge them to Cook. It is not pretended that there is any difficulty about ascertaining what taxes, fines, and executions went into the hands of Cook, and mere allegations of such difficulty, without facts to support them, such as that records had been burned or destroyed or lost, would be utterly insufficient. The tax books on file in the sheriff's, county clerk's and auditor's offices show the taxes for the District of Rock, undoubtedly. All these taxes for certain years went into the hands of Cook for collection except what were retained for collection by White, and there seems to be no dispute about what portion of the taxes White retained for collection. The license taxes, fines and executions are all matters of record. Therefore, as to these matters, no discovery is necessary. After ascertaining what Cook is chargeable with, which is easy of accomplishment, so far as shown by this bill, it devolves upon Cook to show that he has accounted for it according to law, by payment to White in money or orders, either actually delivered to him, or paid by Cook and credited to White in his settlements, or paid to the State, execution creditors, or other persons legally entitled to receive it. He is entitled to credit for all proper disbursements made by him. Such are un-

doubtedly the views held by JUDGE MOORE in the *Lafever* v. *Billmyer Case,* for he says: "In all those matters of execution and administration, the records would enable the plaintiff to designate, with absolute certainty, the parties and their claims." In matters of account, as to legal demands, a court of equity rarely, if ever, has concurrent jurisdiction unless discovery is necessary, except where the accounts are mutual. *Lafever* v. *Billmyer,* 5 W. Va. 33; *Yates* v. *Stewart,* 39 W. Va. 124; *Thompson* v. *Whittaker Iron Co.,* 41 W. Va. 580. If accounts between sheriffs and their deputies can be drawn into a court of equity upon such allegations as are contained in this bill, other matters, of a similar nature, would follow and but a short time would be required to utterly break down and obliterate the line of demarkation between law and equity jurisdiction where matters of account are involved.

Another objection to the bill is, that no order has been made by the county court or board of education requiring Cook to pay over the balance due, respectively, to the county court and the board of education. This position is untenable. While these funds in the hands of Cook are public in their nature and primarily belong to the county and district funds, and possibly other funds, Cook is but the agent or representative of White and the funds must reach their ultimate destination and application and settlement through White, the principal, or his personal representative, he being dead. Any order that may be made in respect to them would be directed to White and not to Cook. Prior to the making of such order, White's personal representative has the right and power to compel Cook to pay over these funds, to the end that they may be in hand and ready when the order is made. *State* v. *Hayes,* 30 W. Va. 107; *Board of Education* v. *Parsons,* 22 W. Va. 314, 580; *Board of Education* v. *Cain,* 28 W. Va. 758, have no application here for they were all suits against the sheriff himself, and not actions by the sheriff against his deputy. An action by White's administrator against Cook and his sureties upon the bond is not a proceeding by the State, county court or board of education, but is a proceeding by the sheriff against his agent for money which, according to the allegations of the bill, is due and payable.

It appearing that there is no equity in the bill and that the plaintiff has brought his suit in the wrong court, the decree of

the court below, sustaining the demurrer and dismissing the bill, is affirmed.

*Affirmed.*