# CHARLESTON.

## WILSON v. VALLEY IMPROVEMENT COMPANY.

Submitted September 15, 1910.     Decided November 21, 1911.

MASTER AND SERVANT—*Injury to Servant—Liability of Master— Premises of Third Person.*

A master, having contracted temporarily to perform labor, by and through his servants, upon premises owned and fully controlled by another person, and having no knowledge of danger to his servants from defectiveness of the premises or machinery and appliances of such third person, incidentally and casually to be occupied and used by them for the purpose, and not having guaranteed the safety or suitableness thereof, is under no duty to inspect the same, nor liable for an injury to his servant, occasioned by defects therein. (pp. 778 to 790).

Error to Circuit Court, Randolph County.

Action by Percy H. Wilson by his next friend, against the Valley Improvement Company. Judgment for plaintiff, and defendant brings error.

*Reversed, and Judgment for Defendant.*

*E. A. Bowers, W. E. Baker,* and *J. B. Sommerville,* for plaintiff in error.

*Talbott & Hoover* and *J. L. Walmsley,* for defendant in error.

POFFENBARGER, JUDGE:

The defendant in error, a minor, suing by his next friend,

recovered a judgment for $1,941.67 against the plaintiff in error, as damages for a personal injury, upon a legal theory which presents a case, differing from any heretofore decided by this Court.

Though the servant of the defendant below, he was a special servant of a third party at the time of the injury and incurred it on the premises and in the service of the special, not the general, master. Under such circumstances, recovery is ordinarily sought from the former, but, in this instance, the injured servant has sued the latter, charging liability upon the legal hypothesis of an obligation on his part to furnish a safe place in which to work on premises not under his control, or duty to inspect the same and warn the servant of any danger that would have been disclosed by such inspection as reasonable care and prudence demanded.

The Valley Improvement Company was engaged in the generation and distribution of electricity to consumers thereof, and also in the installation of wires and other appliances in buildings and factories for the utilization of its product, in which work it employed Wilson. On the occasion of his injury, Wilson and one Ray Smith were wiring a building owned by the Elkins Refrigerator and Fixture Company, having been sent there for the purpose by the Valley Improvement Company, and, in doing so, they used a scaffold, erected by servants of the former, and composed of boards, called hangers, nailed to and suspended from an overhead beam, called a purlin, and pieces of boards nailed across the lower ends of the hangers on which other boards were laid horizontally for a platform. The perpendicular boards were rather thin and of soft wood, bass or lynn, and the cross boards on which the floor rested were spruce or hemlock. After this scaffold had been used for wiring one part of the building, the refrigerator company servants moved it to another place. This was done in the forenoon of the same day on which it gave way, about 3 o'clock in the afternoon, and injured Wilson and Smith. The hangers, or some of them, broke loose from the overhead beam and precipitated the occupants to the floor, a distance of 20 to 25 feet, among a lot of machinery, and broke both of Wilson's legs.

Respecting the terms of the contract, which was informal and verbal, and the incipient relations and circumstances, the evi-

dence is not as clear as it should be; but the contract does not seem to have imposed any obligation upon the electric company to furnish or construct any scaffold, since the compensation for its work was to be measured by the wages paid its men and the cost of its materials, with an additional 10% as profit, and the servants were directed to call upon the refrigerator company for scaffolds, if any should be needed. The wiring had been commenced by another party and abandoned, and it seems the scaffold in question had been erected for, and used by, the predecessors of Wilson and Smith.

The principal assignment of error raises a question of law, going to the very foundation of the case. Conceding all the evidence proves or tends to prove, it denies liability, saying that, for the purposes of the case, Wilson was the servant of the refrigerator company, and not of the electrical company.

A servant sent by his master to perform work upon the premises and among the servants of a third party is sometimes regarded as the special servant of the person to whose premises he is sent and among whose servants he works. That he was sent there by his general employer and receives compensation from him for his services is not incompatible with the relation of master and servant between him and such third person, and, if he is injured by the negligent act of another servant of the person on whose premises he is working and sues such person for such injury, he cannot recover for the reason that his injury was occasioned by the act of a fellow servant. To this effect, the authorities are uniform. *Hasty* v. *Sears,* 157 Mass. 123; *Killea* v. *Faxon,* 125 Mass. 485; *Johnson* v. *Boston,* 118 Mass. 114; *Rourke* v *Colliery Co.,* 2 C. P. D. 205; *Saunders* v. *Coleridge,* 72 Fed. Rep. 676; *Ewan* v. *Lippincott,* 47 N. J. L. 192. Likewise if the servant so loaned inflict injury upon one of the men among whom he is working by a negligent act, he is regarded as a fellow servant and there is no liability upon his master. *Donovan* v. *Syndicate,* 1 Q. B. D. D. (1893) 629. In this case, the general master sent not only the servant to work for a third party, but also a crane which he was to manage, and in the operation of the crane, he negligently inflicted injury upon one of the servants of the special master. In delivering the opinion, Lord Esher, M. R., said: "It is true that the defendants selected the man and paid his wages, and these are

circumstances which, if nothing else intervened, would be strong to shew that he was the servant of the defendants. So, indeed, he was as to a great many things; but as to the working of the crane he was no longer their servant, but bound to work under the order of Jones & Co., and, if they saw the man misconducting himself in working the crane or disobeying their orders, they would have a right to discharge him from that employment. This conclusion hardly requires authority."

Though our inquiry arises upon a different state of facts and pertains to an injury resulting from an alleged breach of a non-assignable duty of a master, failure to furnish the servant a safe place in which to work or safe appliances with which to work, it becomes necessary to determine whose servant the man was. One theory would impose upon the general master duty to inspect the premises to which he contemplates sending his servant temporarily for a special purpose, and requiring the owner of the premises to make them safe before sending the servant to work in them, or, on his failure to do so, refuse to send the man. In other words, the general master would be under the same obligation to his servant as if he were working on his own premises. Logically this obligation would extend not only to the provision of safe and suitable machinery and appliances, but also to the exercise of care in providing and retaining competent servants and a sufficient number of them, and the establishment and enforcement of rules and regulations for the conduct of the service, necessary to the protection of the servants from injury. All these duties relate to the safety of the place of work. *Jackson v. Railroad Co.*, 43 W. Va. 380; *Madden v. Railroad Co.*, 28 W. Va. 617. This theory would carry the relation of master and servant beyond and outside of any place or conditions provided by the master himself for permanent service, and extend it to conditions which it cannot be reasonably said to have been actually provided by the master at all, since both the place and the appliances are furnished and controlled by a third party. At the most, he could be deemed only to have adopted and treated them as his own. The other theory would absolve the general master from liability for an injury so occasioned and place it upon the special master, who by an act of commission or omission causes the defect or imperfection in the premises, machinery or appliances which actually produces

the injury, and has the best opportunity to discover and remedy it, and also unlimited and unrestrained power to do so.

Unless there is some arbitrary and unyielding rule or principle which forbids it, we may consider and give effect to this difference in the conditions and circumstances, in determining which of the two masters shall be regarded as the master for purposes of liability or indemnity for the injury. No statute forbids it nor do we perceive any inhibitory principle of the common law. For the servant's wages, the general master is liable. He contracted to pay them. The special master is not liable therefor, because he did not agree to pay them. But the obligation to indemnify for injury is not imposed by the contract of service. In this connection, the force and effect of the contract is to bring the parties into a relation under which the law imposes duty on the one in favor of the other, and this duty is founded upon reasons of public policy, not upon the terms of the contract, which are silent upon the subject of duty and the obligation to indemnify. Nothing in the law says a servant of two masters shall have a right to indemnity against both in case of his injury by the negligence of one, nor is there any reason or consideration of public policy which requires it. The ends of justice are attained by providing one source of indemnity, and that source is naturally indicated by the particular facts working the injury. The policy of the law is to fix liability with reference to that cause which stands closest to, and in most immediate connection with, the injurious result. The law books abound with instances of discrimination between remote and proximate causes in fixing liability for negligence. All persons concerned in a series of negligent acts, resulting in injury to some person, are not required to make reparation. The requirement of immediate and direct connection with the last or proximate act of negligence is universal. That policy which accords indemnity to the injured person, whether a servant or a stranger, does not exclude those equitable and just considerations which naturally suggest the direct and immediate author of the injury as the proper source from which to exact the indemnity. This is illustrated by the operation of the fellow servantcy rule. Notwithstanding the relation of master and servant, the negligence of a fellow servant imposes no liability upon the master. We are not to be understood as asserting that the law never gives

two sources of indemnity, but only that it does not do so when the immediate cause of the injury is the act of only one person. There are no doubt circumstances under which two or more persons, joint participants in the negligent act constituting the proximate cause of the injury, can be jointly or severally liable.

Perceiving no legal obstacle to a rule, absolving the general master from liability to his servant for injury resulting from unsafety of a place to work or machinery and appliances furnished by a third party, when the servant is lent to him or sent upon his premises temporarily, to perform a special service with the machinery and appliances found there, and imposing the liability upon the special master, under circumstances ordinarily inflicting it, we proceed to a consideration of the facts and circumstances which naturally suggest the source of indemnity. As has been stated, the special master either causes or suffers the defect to exist. The appliances and premises in which they are found belonged to him. He has the power of convenient, thorough and constant inspection. His ownership and control enable him to remedy the defects economically and with a free hand. He may make such alterations as he sees fit. As to the competency and sufficiency of servants and the provision and enforcement of rules, he likewise has full and unrestrained opportunity for knowledge and power to control. On the other hand, to require these duties of the general master is to burden him with that which is often beyond his power and ability and always inconvenient. He can neither inspect the premises and machinery nor test the competency of the servants nor determine the efficiency of the rules and regulations, nor remedy any defects, without the consent of the owner of the premises. In many instances, he is unable to determine any of these questions with safety to himself or his servant, if allowed to undertake it, because of his unfamiliarity with the business conducted on the premises. The manager of a concern, installing electrical wires and appliances, could not safely determine whether to send his servant to do special work in a rolling mill, a cotton mill, a shoe factory, or an automobile factory, or a locomotive works or car shops or a railway yard, unless he was skilled and proficient in the conduct and management of such a plant, and yet his business necessitates the sending of his servant from time to time into all of them. To require him to determine whether

it is safe to do so, is to impose duty and responsibility beyond the limits of reason and power of performance. His inability to determine the question of safety, because of his lack of knowledge of the business done upon the premises, would often inflict upon a cautious man an enormous loss or hazard, for the rule would require him to undertake the work or refrain from it at his peril. If, under the impression of safety and suitableness of the premises and appliances, competency of servants and efficiency of rules and regulations, he sends his servant and injury results, he is required to make reparation in damages; and if, on the contrary under a misapprehension he thinks the premises defective or the servants incompetent or the rules and regulations inadequate, or if unable to determine whether they are or not, he refrains from undertaking the work, and it turns out that he was mistaken, he loses the business and suffers financial loss. Moreover, the inconvenience to which this duty would subject the general employer largely outweighs the consideration upon which it is supposed to rest, the mere technical relation of master and servant. If all the places in which he proposes to do special work through his servants were open to him, and he were allowed to correct defects and charge the expense thereof, and he possessed the requisite knowledge, ability and skill to make the alterations, the discharge of that duty would carry him widely beyond the scope of his business territorially as well as otherwise. Employers often send their servants great distances to do special work upon premises that could not be inspected otherwise than at the expense of both time and money. Upon all these considerations and others that readily suggest themselves, we are of the opinion that the duty rests upon the special master. If he can be made the master so as to apply the doctrine of fellow servantcy, and he is, it is perfectly consistent to make him the master so far as to require him to provide a safe place for the work of the special servant.

Apparently inconsistent decisions involving or suggesting this question may be reconciled, we think, by a classification thereof, based upon the character of the occupancy of the premises. When the master sends his servant temporarily upon the premises of a third person to perform a special service, he is regarded as the servant of the owner of the premises and not of his general employer; and, in those instances in which the servant's ordinary

and permenent place of work is upon the premises of a third
party, the duty and liability are imposed upon his employer
and he is not regarded as the servant of the owner of the prem-
ises. For the purposes of the business carried on under such
circumstances, the premises are regarded and treated as those
of the employer, though he does not own them, and has by con-
tract absolved himself from any duty to keep them in repair.

In all of the following cases, absolving the general employer
from liability for injuries occasioned their servants upon the
premises of third persons by defects therein, the servants were
sent upon the premises temporarily and to perform special work.
Though the distinction between temporary and permanent ser-
vice upon premises, not owned by the employer, is not adverted
to in the opinions, the occupancy was in fact temporary or
sporadic and for a special purpose. *Wallon* v. *Elevator Co.*,
1 App. Div. (N. Y.) 264, 37 N. Y. Supp. 174; *Hughes* v. *Gas
Light Co.*, 168 Mass. 395; *Murphy* v. *Greeley*, 146 Mass. 196;
*Channon* v. *Sanford Co.*, 70 Conn. 573, 41 L. R. A. 200. In
the last of these cases, the court declares the doctrine we have
adopted in the following terms, and, in part, upon the following
considerations: "Then, again, this general rule, (imposing
liability upon the master for injury resulting from unsafety of
the place in which the servant works), is not ordinarily appli-
cable to cases where the master neither has nor assumes posses-
sion, use, or control, legal or actual, of the premises or place
where the servant may be at work. The general rule is based
upon such possession, use, and control by the master of the prem-
ises where he puts his servants at work for him; and, speaking
generally, his duty to use due care to make and keep such place
reasonably safe flows from, and is measured by, such possession,
use, and control. Just as the master's liability for the acts of
his servants while engaged in his business is based upon his
power to control them, so his duty to provide reasonably safe
premises is founded essentially upon his occupation, use, and con-
trol of such premises. This being the reason of the rule, when
the reason does not exist the rule is inapplicable."

In the following cases and many others, imposing duty and
liability upon the employer for injury occasioned by a defect
in the premises upon which the servant was working, but which
were owned by third parties, the employers used the premises

regularly and permanently, as if they owned them, and, in some, if not all of them, the character of the occupancy was expressly made the basis of liability. *McGuire* v. *Telephone Co.,* 167 N. Y. 208; *Story* v. *Railroad Co.,* 70 N. H. 364; *Doyle* v. *Railroad Co.,* 54 L. R. A. 461; *Railroad Co.* v. *Ross,* 142 Ill. 9; *Smith* v. *Railroad Co.,* 18 Fed. Rep. 304; *Stetler* v. *Railway Co.,* 46 Wis. 497; *Harding* v. *Transfer Co.,* 80 Minn. 504; *San Antonio Edison Co.* v. *Street Ry. Co.,* 17 Tex. Civ. App. 320. In *McGuire* v. *Telephone Co.,* the servant employed by the Bell Telephone Co., of Buffalo, was injured by a defective pole of the Rochester Gas & Electric Co., on which the telephone company had rightfully placed its wires along with those of the other company. In the opinion, the court said: "But in the present case, the plaintiff was employed to work on a line already erected constituting the permanent plant of the defendant. * * * I do not think the fact that the defendant did not own the pole which fell relieved it from the duty of reasonable inspection to see that the pole was safe. The pole formed part of the permanent line of the defendant through the streets of the city of Rochester, * * * By using the pole as part of its line, it adopted it as its own." Distinguishable from this case upon the ground above indicated, is the decision in *Dixon* v. *Telegraph Co.,* 68 Fed. Rep. 630, in which the servant was injured by a defective pole which did not belong to his employer and was not used by it as a part of its line. Denying right of recovery, the court observed: "The pole in question, however, did not belong to the defendant. The use of it was casual, and incidental to the nature of the service in which the plaintiff was employed." In *Munich* v. *Railway Co.,* 29 N. H. 9, the court said: "By using the railroad of another corporation as a part of their track, whether by contract or mere permission, they would ordinarily, for many purposes, make it their own, and would assume toward those whom they had agreed to receive as passengers all the duties resulting from that relation as to the road." In *Engel* v. *Raiload Co.,* 160 Mass. 263, the court said: "The duty of a railroad corporation to furnish for its employes safe tracks, cars, locomotive engines, and other machinery, tools, and appliances with which its business is to be carried on, is similar in kind to its duty to passengers in these respects, although the degree of care required is less. In either case, its

duty is the same when the tracks  *  *  *  are hired, or used under a license from others, as when they are owned by the employer." In all these and other cases of their class, the employers used the premises or works of the third party for usual, ordinary and permanent places of work for their servants. No doubt absolute control and dominion over the premises by the employer for the purposes of his business, though temporary in character, would make him liable for injury resulting from defects in the premises. Such occupancy would be consistent with the theory of ownership for the time being. At any rate, it would be a transaction or use radically different from a mere casual, incidental entry, without any dominion or control at all. So also is the employer liable for injury resulting from a defective appliance belonging to a third party which he uses in his business, provided he has control of it. By using it, he·adopts it as his own for the purposes for which it is used and naturally falls under the same duty to the servant as if he had purchased or had it made for that purpose. *Bridge Co.* v. *Goodnight,* 60 S. W. 415.

Though the relation of master and servant between the owner of the premises and the servant of a third person sent upon them to perform work for·the owner, may be assumed as the basis of legal duty on the part of the owner, as we have already shown, it is probably consistent with legal principles to say that, independently of such relation, the ownership and control of the premises imposes a duty in favor of one who come there upon his invitation. One who invites another expressly or by implication to come upon his premises must use ordinary care and prudence to render the premises reasonably safe for the visit. *Sesler* v. *Coal Co.,* 51 W. Va. 218; *Williams* v. *Coal Co.,* 55 W. Va. 84; *Smith* v. *Parkersburg Assn.,* 48 W. Va. 232; *Schoonover* v. *Railroad Co.,* decided at this term. Of course, a bare licensee, one who comes upon the premises of another, without invitation or by mere permission, for purposes of his own in which the owner has no interest, occupies very much the same position as a trespasser. The owner owes him no duty other than abstention from wilful or wanton injury. But one who comes upon the express or implied invitation of the owner holds a different status. The invitation carries with it a representation or guaranty of the exercise of reasonable care for his safety while upon the

premises. The owner of a mill, or other place of business, in requesting another person to send his servants there to perform work beneficial to the owner, extends an invitation to such persons as are sent in obedience to the request, and when they arrive, they are there on business for the owner of the property, as well as their master, and are, therefore, entitled to exact the same sort of duty from the owner of the premises as if they were in fact his own servants.

Our conclusion that the relation existing between the plaintiff and the defendant imposed no duty upon the latter in respect to the safety of the premises upon which the former was hurt, in the absence of additional facts or circumstances, seems to be well sustained by *Coughtry* v. *Woolen Co.*, 56 N. Y. 124, 15 Am. R. 387, and *Devlin* v. *Smith*, 89 N. Y. 470, 42 Am. R. 311. In the first of these cases, the owner of a mill contracted with a builder to put a cornice on it, the owner agreeing to erect a scaffold for the purpose free of cost. The builder sent his servant upon the scaffold to do the work and it fell and killed him. The owner of the mill was held liable. A part of the reasoning of the court was as follows: "At the time of the injury the scaffold belonged to the defendant, had been erected by it, was in its possession and was being used on its premises, with its permission, for the very purpose for which it had been furnished, and by the persons for whose use it had been provided. The only operation which the contract has in the case is to preclude the defendant from setting up that the defective structure was not its own but that of the contractors. Being conceded to be its own structure furnished by it for use, the duty of due diligence in its construction arose, not merely out of the contract to furnish it, but from the fact that the defendant did actually furnish it for the express purpose of enabling and inducing the men who were to do the work to go upon it." In the other case, the master, a painter, having contracted to paint the interior of a dome, employed an experienced scaffold builder to erect a first-rate scaffold in the building to enable him, the painter, to do his work. A servant of the painter having gone upon the scaffold, it gave way and caused his death, while at work upon it in his master's employment. Both the employer and the builder of the scaffold were sued and the court held the former not liable and the latter liable.

What has been said thus far is no doubt subject to certain qualifications and limitations. If the general master has knowledge of the dangers and defects into which he is sending his servant and fails to give him any warning thereof, he would probably be liable for any resultant injury. Some of the authorities so hold. It may be possible, too, that an express guaranty of the suitableness and safety of the premises and appliances would make the general master liable, upon the same principle. *Channon* v. *Sanford Co.*, 70 Conn. 573, 41 L. R. A. 200, 204. In that case, the court said: "The question on this part of the case is whether, if no such duty rested upon the defendant by law, the facts found warrant the conclusion, as matter of law, that it assumed such a duty. The strongest thing in the finding in favor of such a conclusion is the fact that the defendant assured the plaintiff that the staging would be entirely safe; but this fact, taken either alone or with the other facts found, clearly does not warrant any such conclusion as matter of law. The assurance was given at the very time that the defendant told the plaintiff about the strong staging that had been already erected and in use in the building, and at the very time when plaintiff was informed Caulfield, and not the defendant, was to see to the staging. What the defendant said to the plaintiff, as detailed in the finding, falls far short of an agreement to be responsible for the staging already built, or to be built, by Caulfield or his servants."

We have no evidence here tending to prove any undertaking on the part of the defendant for the safety of the scaffold, nor of any agreement that the refrigerator company was to build the scaffold for the defendant. In other words, there is nothing here to indicate that the building of the scaffold was within, or a part of, the defendant's contract. No evidence adduced would warrant a jury in saying the refrigerator company built the scaffold, as the agent of the defendant. All that appears is that its servants did build it and that the defendant's servants were advised that the refrigerator company people would build it, if needed. Hence we think it clear that no duty was imposed upon the defendant by any special contract or undertaking for the safety of its servants. If there was any such agreement no evidence of it has been adduced, wherefore we are not called

upon to say what its effect would have been, had there been such an undertaking. Nor does the evidence tend to prove knowledge of danger or unfitness, on the part of the defendant.

Of course, we do not say the plaintiff is entitled to recover from the refrigerator company. As that company is no party to this litigation, and we can decide nothing against it. There may be defenses that will exonerate it from liability, and it is not the purpose of this opinion to preclude or limit them in any respect. What has been said here, indicating right to idemnity from that company, is mere argument· in the process of deduction of the rule or principle by which to determine the question of liability of the defendant in this action.

The case went to the court on a demurrer to the evidence. For the reasons here stated. The judgment will be reversed, the demurrer sustained and judgment rendered for the defendant.

*Reversed, and Judgment for Defendant.*