CLARA W. STANTON, *Admx., etc. v.* RUTHBELL COAL COMPANY

(No. 9650)

Submitted April 25, 1945. Decided May 29, 1945.

*F. E. Parrack,* for plaintiff in error.
*Francis M. Shea,* Assistant Attorney General, *Arnold*

*Levy,* Special Assistant to Attorney General, and *Harry I. Rand,* Attorney Department of Justice, and *Martin J. Cole,* Attorney, Solid Fuels Administration for War, for the United States as amicus curiæ.

*Richard E. Davis* and *Clarence Roby,* for defendant in error.

RILEY, JUDGE:

Clara W. Stanton, administratrix of Ernest L. Stanton, deceased, instituted this action of trespass on the case in the Circuit Court of Preston County, to recover damages for her decedent's death while he was employed as a coal miner in a mine alleged to have been owned and operated by the defendant, Ruthbell Coal Company. This writ of error is prosecuted to a judgment in the amount of sixty-five hundred dollars in plaintiff's favor based upon a jury verdict.

The declaration avers that on August 27, 1943, the day of the accident, decedent was employed by defendant in its coal mine in Preston County. It sets forth that defendant was negligent in that it did not operate the mine with reasonable safety and ordinary care and subjected decedent to extraordinary risks and hazards; that it failed to instruct decedent in the dangers of his employment and failed to provide tools, appliances, props and machinery reasonably safe and necessary for decedent's use; that it employed negligent and incompetent employees and failed to keep a sufficient number of experienced employees; that it did not provide decedent with a safe place in which to work; that it did not elect to become a subscriber to the Workmen's Compensation Fund; and that it negligently permitted slate, coal and earth to hang loosely in and about the roof of the mine.

The defendant pleaded the general issue and filed three other pleas, one a plea in abatement and two special pleas in bar, asserting that the Government of the United States under an Executive Order issued by the President of the United States, was, on August 27, 1943, decedent's em-

ployer and in complete possession and control of the mine and its operation, and therefore defendant was under no liability whatsoever.

The trial court sustained plaintiff's demurrers to the plea in abatement and the two special pleas in bar. On the trial defendant again attempted to set up as a defense under the general issue the fact of Government control and offered in evidence a telegram sent to defendant's president, C. W. Craig, by Harold L. Ickes, Solid Fuels Administrator for War, dated May 1, 1943, appointing Craig as the operating manager for the United States of defendant's coal mine, a copy of the Executive Order of the President, dated May 1, 1943, authorizing said Ickes to take charge of any and all coal mines in which a strike or stoppage of work has occurred or is threatened, and a copy of the Regulations for the Operation of Coal Mines under Government Control, dated May 19, 1943, promulgated by the Secretary of the Interior of the United States under the Executive Order. The court ruled that defendant was precluded from such defense by the court's rulings upon the demurrers to the pleas and rejected the evidence.

Pursuant to the President's Order, Government control over defendant's mine was established on May 12, 1943, and maintained until it was terminated by an order of September 3, 1943. The Regulations, dated May 19, 1943, for the Operation of Coal Mines under Government Control, promulgated by the Secretary of the Interior under the Executive Order of May 1, 1943, recite that the primary object of Government intervention in the operation of coal mines "is the maintenance of full production of coal for the effective prosecution of the war." They provide that: (1) Wherever the cooperation of the coal company and its personnel can be secured, the existing organization of the company will be utilized, and the company will continue operation in its regular course of business conforming with such directions as the Government may issue; (2) title to the properties is to remain in the mine owners, the Government "having temporarily taken possession or custody" and asserting "only such rights

as are necessary to accomplish the national purpose of continued and maximum production"; (3) that operating managers for the mines are to be appointed upon nomination by each company and may be removed at the company's request; (4) that the operating manager and the other officers and employees of the mining company, subject to their responsibilities to the Government and Orders and Regulations of the Solid Fuels Administrator "shall serve as agents and employees of the company with respect to all actions which they would have been empowered to take on behalf of the company in the absence of Government control of its property", and nothing in the Regulations shall be construed as recognizing the personnel as officers and employees of the Federal Government within the statutes relating to personnel, and that the mining company's personnel and property shall "remain subject during the period of Government control to all Federal and State laws and to actions, orders, and proceedings of all Federal and State courts and administrative agencies."

On August 25, 1943, plaintiff's decedent was employed to work in defendant's mine by one Peter Titchenell, who testified that he was defendant's assistant foreman at Ruthbell Coal Company Mine No. Three. Titchenell was experienced in timbering mines. Decedent was injured in the early evening of August 27, 1943, and died as a result of his injuries on August 28, 1943. At the time injured, decedent, together with David W. Morgan, a fellow-employee who had been employed on the same day with decedent, went to work at two o'clock in the afternoon in driving a cross entry through one heading to a cross entry leading from another heading, being driven by two other employees, Samuel Forman and Robert Hornby. After the cross entry in which decedent and Morgan were working had been driven a considerable distance toward the opposite entry, a fault was encountered. It then became necessary for the workers to go back some distance and drive along the left of the fault.

Late in the afternoon or early in the evening the break-

through was accomplished. Stanton was the first to step through the opening into the other cross entry. He then came back through the hole and was fatally injured by the fall of a large rock from the roof of the heading which he and Morgan had been driving. Just before the rock fell, Morgan said to decedent, "You had· better look out, there's a crack in there." The rock was near or at the place where the cross entry was turned to the left for the purpose of avoiding the fault. When Morgan went to work that day he noticed a large rock overhead. Shortly before Stanton was injured, and ·almost immediately· before the rock came down, he looked up, saw the crack in the roof and warned decedent, "Do you see that crack up there in the roof?". Morgan was so close to Stanton when the latter was injured that the draft caused by the fall of the rock extinguished his light.

There were no props or cross bars supporting the roof at the place where Stanton and Morgan were working when the break-through was accomplished, though a safety post had been placed under one end of the rock by Norman J. Field, a timber-man, who testified that he set the post at the end of the rock, "where I found it needed it." This witness, over objection, was permitted to express the opinion that from his experience as a "skilled timberman", the roof could have been supported. He testified that the opening where Stanton was injured was too narrow to permit the laying of tracks, but was wide enough to be timbered on each side with cross bars overhead and permit the men to work. Witnesses testified variously as to the width of the opening at the point where the rock fell, their estimates varying from 6 to 12 feet. Titchenell estimated that the cross cut was six feet, three inches at the narrowest place.

Titchenell inspected the place three times on August 27: in the morning, in the afternoon about one o'clock, and again about eight o'clock in the evening, a few minutes before the rock fell. He was present about the time of the break-through, but left before Stanton was injured. He saw the rock, noticed the crack in the roof which was at

the end of the rock and wide enough to permit the insertion of a human finger. He saw Field install the safety post. He testified that on the occasion of his last inspection, he told the men working there, "Now, men, if the cut shows any break or anything after you get it through timber it up so it will be safe; if there is any crack." He admitted he talked to Field in the morning and told him, "We'll set a heavier [one] as soon as we can get the post in", but the record does not affirmatively show that a heavier post was substituted before the rock fell, though there is evidence indicating that on the day following there was a post standing at or near the place where the safety post had been installed by Field, which may or may not have been the same post.

Both Morgan and decedent evidently had little mining experience and none in mine timbering. The former had no miner's certificate, and as to whether decedent did the evidence conflicts.

Plaintiff's witness, George McIntyre, a district mine inspector for the State of West Virginia, who had worked in the mines for forty-five years, been mine inspector for ten years, and timbered in mines about forty years, made an inspection of the place where Stanton was injured at the instance of the State Mining Department. He testified that he did not notice any props or cross bars on the occasion of his inspection. Over objection, he was permitted to testify that from his experience it was practicable to support by means of cross bars the stone which injured decedent; that the place could have been made safe by cross bars, if the condition had been known to the mine foreman and that the cross cut should have been cross barred, if the crack earlier in the day had been pointed out to the mine foreman.

The allegation contained in the declaration that defendant did not elect to become a subscriber to the Workmen's Compensation Fund was admitted by defendant on the record.

The United States lodged for filing a brief as *amicus curiae*, to the filing of which defendant objected. The

brief was not timely filed in accordance with the practice prevailing in this Court, so that counsel for defendant would have an opportunity to answer it. Leave to file the brief is refused. Such matter lies within the discretion of this Court.

The defendant assigns four grounds for reversal: (1) That plaintiff has not established that defendant was guilty of primary negligence proximately resulting in decedent's death; (2) that the court erred in permitting the witness, Norman J. Field, to testify that as a "skilled timberman" and experienced in timbering mines, he was of the opinion that the roof of the opening could have been reenforced and should have been timbered, and the witness McIntyre to give his opinion testimony as hereinbefore set forth; (3) defendant's instruction No. 4 should have been given; and (4) the court improperly rejected defendant's pleas setting up Government control as a defense, and the documentary evidence in support thereof. For convenience these grounds will be considered seriatim.

Decedent and his co-worker had little mining experience and no experience as timbermen. Both had been employed at defendant's mine for the first time on August 25, 1943. They had been hired by Titchenell, defendant's assistant foreman, an experienced timberman, who was in charge of the mine in which decedent was injured. Titchenell inspected the place of work on three occasions on August 27, the last time immediately before the rock fell. In the morning he saw Norman Field install the safety post at the end of the rock and observed the crack in the roof. He told Field that a heavier post should be substituted for the one then being installed. On cross-examination he admitted that cross bars could have been set, and we cannot say from this record that, as a matter of law there was insufficient room for such installation. Witnesses testified variously as to the width of the cut, their estimates ranging from six to twelve feet, and Titchenell himself admitted that at the narrowest place the cross cut was six feet, three inches. The cut was wide enough for men to work in after cross bars had been

installed, according to Field, but not wide enough for the laying of tracks. If the opinion testimony of Field and McIntyre is admissible, a matter which will be discussed later in this opinion, the failure to install cross bars under the roof where the rock was located and the crack appeared might have caused plaintiff's injuries. At least the jury was entitled to find that such failure rendered the place where decedent was working dangerous and unsafe, as alleged in the declaration. Code, 22-2-53, charges Titchenell, as defendant's assistant mine foreman, with the duty to visit and carefully examine each working place in the mine each day while the miners in such place are at work, and further to see that the working place is secured by props or timbers to the end that it may be made safe. Under this statute, he was also charged with the duty, if he found the place in which decedent was working to be in a dangerous condition, not to leave it until it was made safe or to remove persons working therein until the place was made safe. Whether Titchenell's failure to carry out his statutory duty and to cause the installation of cross bars proximately resulted in decedent's injuries is for jury determination. If he was negligent in this regard, his negligence is to be charged to defendant. He was decedent's immediate superior. As such he was in charge of the place in which decedent was working at the time he was injured. The control which he had over decedent would render defendant responsible for his negligence. *Waldron* v. *Garland Pocahontas Coal Co.,* 89 W. Va. 426, 437, 109 S. E. 729; *Wilson* v. *Valley Improvement Co.,* 69 W. Va. 778, 785, 73 S. E. 64. And the fact that there was a concomitant duty upon decedent, under Code, 22-2-59, to "thoroughly examine the roof and general conditions of his working place before commencing work, and if he finds loose rock or other dangerous conditions, he shall not commence work in such place until it has been made safe, or unless it be for the purpose of making such place safe," is no defense to this action. The defendant having failed to become a subscriber to the Workmen's Compensation Fund, the defense of contribu-

tory negligence, as well as other cómmon law defenses, is not available to defendant under Code, 23-2-8.

Defendant's objection to the admission of the opinion testimony of Field and McIntyre is without substantial merit. Field testified "as a skilled timberman", experienced in timbering mines, that the roof could have been supported. Defendant's counsel says that the question addressed to Field assumed his skill and experience, but the record discloses that he had had at least one year's experience in the practical work of timbering. McIntyre had had about forty-five years' experience working in coal mines; he had timbered for about forty years; and had been state mine inspector for ten years. The testimony of these witnesses was properly admitted.

Defendant's complaint of the trial court's action in refusing defendant's instruction No. 4 will not be heard here for the reason that Rule VI(e) of the Rules of Practice for Trial Courts was not complied with. The defendant did not except to the trial court's ruling in this regard.

Finally, defendant complains of the trial court's action in sustaining plaintiff's demurrers to the plea in abatement and the two special pleas in bar, setting forth Government control and possession of defendant's mine and in refusing to admit into evidence the Executive Order of the President providing for Government possession and control of coal mines, acting through the agency of the Secretary of the Interior of the United States as Solid Fuels Administrator, the Proclamation of the Administrator purporting to effectuate Government control, and the "Regulations for the Operation of Coal Mines under Government Control", issued on May 19, 1943, and amended on July 29, 1943, and August 13, 1943. The President's Order provides that the Secretary of the Interior shall take over such control of coal mines as he may deem necessary to accomplish the primary object of government possession, which is set forth in the Regulations as "the maintenance of full production of coal for the effective prosecution of the war."

The Regulations, in our opinion, clearly indicate that,

except and only if necessary to effect the primary object of Government control, such control would be nominal. In *Warner Coal Corp. v. Costanzo Transp. Co.,* 144 F. 2d 589, (certiorari denied by United States Supreme Court, 65 Sup. Ct. 432) the United States Circuit Court of Appeals for the Fourth Circuit in holding that notwithstanding Government control of coal mines, under the Executive Order of May 1, 1943, and the Regulations "there was no interference with the operation of the Coal Company's mines". In this regard, this case must be distinguished from those involving the complete and exclusive Government control of railroads and communications systems during World War I, under the Federal Control Act (March 21, 1918, C. 25, 40 Stat. 451). In *Missouri Pacific Railroad Company v. Ault,* 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087, Mr. Justice Brandeis succinctly stated: "By the establishment of the Railroad Administration and subsequent orders of the Director General, the carrier companies were completely separated from the control and management of their systems. Managing officials were 'required to sever their relations with the particular companies and to become exclusive representatives of the United States Railroad Administration.' * * * The railway employees were under its direction and were in no way controlled by their former employers." In *Virginian Railway Co. v. Mullens,* 271 U. S. 220, 46 Sup. Ct. 526, 70 L. Ed. 915, the Supreme Court of the United States held that a railroad company is not liable for floodings of private land resulting from a condition of the railroad structure amounting to a nuisance, where the nuisance was created by its predecessor in title, and where the injurious consequences occurred when the railroad had been taken over and was being operated by the Government under the Federal Control Act. The Court in arriving at its decision relied in part upon General Order No. 50, issued October 28, 1918, by the United States Railroad Administration (Bulletin No. 4, Revised, 334), which directed that actions and suits based on claims for injuries to persons, damage

to property, etc., growing out of the possession, use, control or operation of any railroad by the Director General should be brought against that officer and not otherwise. In *North Carolina Railroad Co.* v. *Lee, Admx.*, 260 U. S. 16, 43 Sup. Ct. 2, 67 L. Ed. 104, the Supreme Court held that a railroad corporation whose line, while leased to another, was taken over by the Government, under the Federal Control Act, cannot be held liable for personal injuries occasioned during Federal control, under the local rule making lessor railroads liable for the negligence of their lessees. And in *Davis* v. *O'Hara*, 266 U. S. 314, 45 Sup. Ct. 104, 69 L. Ed. 303, the same Court held that an action by an employee of the Director General for personal injuries, sustained in the operation of a railroad under Federal control, is against the United States, and the sovereign immunity from suit is waived only to the extent clearly indicated by the Federal Control Act and the Orders of the Director General. From these cases it can be readily seen that under the Federal Control Act and subject to the provisions thereof, the Director General of Railroads was liable for personal injuries, death, or property damage, resulting from the negligent operation of the railroads, though the carriers themselves had no such liability.

On the contrary a person injured during Government control, or his personal representative, if he is killed, cannot under the Executive Order of May 1, 1943, the Solid Fuels Administrator's Proclamation, and the Regulations have any recourse against the United States or the Administrator. The Regulations provide, among other things, that "he [operating manager] and all other officers and employees shall serve as agents and employees of the company with respect to all actions which they would have been empowered to take on behalf of the company in the absence of Government control". Such officers and employees are not to be considered employees of the United States within the meaning of the statute governing personnel. Section 24 of the Regulations provided that,

"The mining companies, their personnel and their property are deemed to remain subject during the period of Government control to all Federal and *State laws* and to actions, orders, and proceedings of all Federal and *State courts* and administrative agencies. * * * *The mining companies are deemed to remain subject to suit as heretofore.*" (Italics supplied.) In our opinion, these Regulations expressly provide against Government liability and the relief of the mining companies subject to Government control from the liability which it had in the absence of Government control. There being no recourse against the Government for personal injuries or death of mine workers resulting from the operation of coal mines held under Government control, such as existed under the Federal Control Act governing railroads and communications systems during the last war, a construction of the Regulations that would relieve the defendant coal company from liability in this action on the basis of Government control would create a grave injustice. It would not be consonant with justice and fair dealing for this Court to hold, as we must, that there is no liability against the Government, because it has not consented to be sued; and at the same time say that because of Government control a defendant, who has failed to become a subscriber to the Workmen's Compensation Fund, is relieved from liability for negligence in the operation of its mine. To so hold would render a worker in a coal mine helpless against the negligence or wrongdoing of his employer where the employer, as in the instant case, has failed to protect its employees by subscribing to the Workmen's Compensation Fund. In the case of *Quinn* v. *Southgate Nelson Corp.,* 121 F. 2d 190, decided by the United States Circuit Court of Appeals for the Second Circuit, certiorari in which was denied by the Supreme Court of the United States (314 U. S. 382), which involved the death of a bridge tender, due to negligence of the master, officers, and crew of a ship, which was a part of a fleet owned by the United States Maritime Commission, operated by the defendant,

pursuant to a contract with the commission, the Court held the defendant corporation liable for decedent's death, notwithstanding the contract under which the ship was being operated at the time decedent was killed, provided that the commission retain a power of veto over defendant's selection of licensed officers, and in return for services to be rendered, consisting of managing, operating and conducting the business of the steamship line, and commanding, equipping, victualing, supplying, and operating of the vessels, the defendant was to receive from the Commission all of its operating costs and its overhead expenses, but was to receive no share of the profits and bore no part of the losses. That case, in our opinion, is sound. *A fortiori*, in the instant case, where defendant company was operating a coal mine, subject to Government control on defendant's own account and for its own profit, it should not be relieved from liability for the negligence of its officers and agents in the operation of its mine. The circuit court's rulings, in our opinion, were proper in sustaining plaintiff's demurrers to defendant's plea in abatement and special pleas and refusing to admit the documentary evidence in support thereof. For cases illustrative that the Executive Order of May 1, 1943, and the Regulations promulgated thereunder did not effectuate a virtual control of the operation of coal mines, see *Warner Coal Corp.* v. *Costanza Transp. Co., supra; Consagra Coal Co.* v. *Borough of Blakely,* 55 F. Supp. 76, holding that the operating manager of a mining company, appointed under Government control of coal mines, together with the mining company, could not bring a suit for the United States to enjoin an alleged illegal and tortious interference with the operation of a coal company's mines; and *Glen Alden Coal Co.* v. *National Labor Relations Board,* 141 F. 2d 47, in which the United States Circuit Court of Appeals for the Third Circuit held that notwithstanding government control of coal mines, the right of mine workers to bargain collectively and engage in concerted activities was not abridged, and the coal company remained obligated to comply with the order of the Labor Board.

For the foregoing reasons, we are of the opinion that the judgment of the Circuit Court of Preston County should be affirmed.

*Affirmed.*