The bill was filed by the Attorney-General to enforce the provisions of chapter 38 of the laws of 1946, R.S. 34:13B, as amended and supplemented by chapters 47 and 75 of the laws of 1947, R.S. 34:13B-13, c., and of executive measures taken pursuant thereto. Before the suit was brought to final hearing, the labor dispute between the defendants New Jersey Bell Telephone Company and the Traffic Telephone Workers Federation was settled, and no injunction is needed, and therefore none will be granted. General Leather, c., v. Luggage, c., Local No.49, 119 N.J. Eq. 432; 121 N.J. Eq. 101. The State also seeks in this suit a declaratory judgment. While the questions presented are legal rather than equitable, I will proceed to consider them, or some of them, for several reasons: The United States District Court stayed its hand in confidence that the issues arising under the federal constitution would be decided by Chancery in the present suit. Our statute expressly authorizes the Attorney-General to sue in Chancery for a declaratory judgment.R.S. 34:13B-26. The case has been fully argued, and for the court now to dismiss the suit for lack of jurisdiction and require the parties to start anew, would be contrary to the spirit of the new Constitution of New Jersey.
The telephone company argues that the seizure of its plant by the Commissioner of Labor, pursuant to the statutes above cited and the executive order of the Governor, deprived the *Page 787 
company of its property without due process of law, inasmuch as no compensation is provided for the State's use of the property, or for any damage resulting from the seizure. It appears, however, that the company was not actually dispossessed and that it suffered no loss or damage whatever. The Commissioner merely served the Governor's executive order on the company and announced that he was in possession and control of the company's facilities. He was provided with an office by the company, observed developments of the strike, conferred with representatives of the company from time to time, but did not interfere with or participate in the management or conduct of the company's operations. The seizure was only what counsel calls a "protective custodianship;" it did not deprive the company of its property and violated no right of the company. If the State had actually deprived, or attempted to deprive, the company of its property under color of the statute, a very different legal situation would be presented and one with which I need not deal.
The pro forma seizure was enough, however, to bring into operation the provisions of the statute requiring arbitration and forbidding a strike. We had become familiar with this kind of operation during the war and it was probably exactly what the legislature had in mind when it enacted these statutes.
Compulsory arbitration does not violate any constitutional right of the telephone company. That company is a public utility, entrusted by the State with public powers to be exercised for the public good. Under special franchises, it maintains its pole lines and conduits in the public highways; it exercises the power of eminent domain. R.S. 48:17-8 and 9. It has, under the protection of our law, a monopoly of the telephone business in the greater part of the State. It must continue to furnish telephone service to the public as long as it holds its privileges and franchises. McCran v. Public Service RailwayCo., 95 N.J. Eq. 22. The Governor, acting under the statute, has found that the company furnished a necessary and essential service to the citizens of the State and that a discontinuance of the operations of the company threatens seriously the public interest, and nothing in the proofs points to the contrary. For many years, the State, *Page 788 
through the Public Utility Commission, has required that the service rendered by public utilities shall be adequate and shall be furnished at reasonable rates. No service at all would be a greater evil than inadequate service at exorbitant rates, and certainly the State can take proper measures to avert the greater evil. The statute is concerned with the situation where a cessation of service arises from, or is threatened by, a labor dispute which the public utility and its employees are unable to settle by collective bargaining and mediation. Arbitration is the ordinary third step. Brotherhood, c., v. Toledo, c.,Railroad Co., 321 U.S. 50; 64 S.Ct. 413. If the parties do not voluntarily agree to arbitrate, the State may require them, or at least the company, to do so, for it is a reasonable and apt measure for securing uninterrupted telephone service. StateBoard of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504;Wilson v. New, 243 U.S. 332; 37 S.Ct. 298. The decision ofCharles Wolff Packing Co. v. Court of Industrial Relations,262 U.S. 522; 43 S.Ct. 630, is not contrary to this view.
It is also argued that the sections providing for arbitration are an unconstitutional delegation of legislative power because the Board of Arbitration is not provided with adequate standards. The board of directors of the telephone company has primary authority on behalf of the company to submit a dispute over wages and conditions of employment to the decision of arbitrators, even though the arbitrators are given as wide a scope as is the Board of Arbitration under our statute. Such arbitrations have been so common for years that the submission cannot be questioned. Now, to paraphrase the language of Mr. Justice Swayze in PublicService Gas Co. v. Board of Public Utility Commissioners,84 N.J. Law 463 (at p. 485); affirmed on his opinion,87 N.J. Law 581 (at p. 597): The legal right of the directors to determine the wages to be paid by the corporation, or to submit to arbitration, is of no higher character than the right of the State to do so. To the same effect is West Jersey, c., Co. v.Board of Public Utility Commissioners, 87 N.J. Law 170, upholding a statute which made void every lease of railroad property unless it had the approval of the Board of Public Utility Commissioners. Chief-Justice Gummere wrote, "If the legislature *Page 789 
cannot delegate to a public utility board the power to pass upon the propriety of the provisions of a proposed lease because of constitutional inhibitions, it necessarily follows that for the same reason it cannot confer upon boards of directors, or stockholders of a public utility corporation, a power which is identical in its essence." Both the board of directors and the Board of Arbitration are created by the State and receive all their powers from the State. But if we adopt the argument presented by counsel for the telephone company, that the Board of Arbitration must be furnished with adequate standards, I am satisfied the statute by implication furnishes them. The statute directs the Board to hold hearings and to receive proofs material to the issues presented; to make written findings of fact, supported by the evidence, and to base their decision thereon. The Board is not permitted to act from caprice or malice. It is clearly implied that the Board should fix just and reasonable wages and conditions of employment. That the standards and policies to which the Board must conform need not be expressly stated, but may be implied from the general tenor and purpose of the statute, appears from West Jersey, c., Co. v. Board,supra. The court in that case found that the implied legislative purpose was to prevent a lease being made which contained provisions inimical to the public interests, or which omitted provisions requisite for the protection of those interests. While the standards which govern the Board of Arbitration are vague, they are probably as definite as the subject-matter permits, and that is sufficient. Veix v. Seneca Building and LoanAssociation, 126 N.J. Law 314 (at p. 325). They are as definite as the requirement that the Public Utility Commission shall fix "just and reasonable" rates, R.S. 48:2-21, and shall require "adequate and proper service," R.S. 48:2-23. The statute does not delegate power to make a law.
The defendant labor union argues that compulsory arbitration deprives its members of the equal protection of the law. It has long been recognized that the thousands of men and women who invest their savings in a public utility subject their capital in a large degree to the regulation and control of the state. It is entirely reasonable to consider that one *Page 790 
who enters the employ of a public utility, such as the defendant company, likewise assumes a special relation to the public. Capital alone cannot furnish telephone service; there must be natural persons to operate the system. Employer and employees are part of one organization, which is an instrumentality of the State, for the service of the public. The legislature may properly classify public utility employees as a group apart from other employees and enact laws that directly touch them but not other employees.
The union also contends that compulsory arbitration impairs the employees' liberty to contract for the sale of their own labor and imposes involuntary servitude upon them.
Under our Corporation Law, in the absence of special regulation, it is the function of the board of directors of a public utility company to fix the rates it charges its customers and the wages it pays its employees. The board probably acts after conferring formally or informally with representatives of the groups concerned — but the board acts. Or, under our law, instead of the board of directors, the Public Utility Commission may fix the rates charged customers and the Board of Arbitration the wages offered to employees. In either case, the customer must pay the rate which is set or go without the service and the employee must accept the wage offered or seek employment elsewhere. It takes two to make a bargain, and whatever limits the freedom of action of one party, indirectly affects the other party. But neither the customer nor the employee is deprived of liberty to contract inasmuch as he is free to reject the utility's offer.
The argument about involuntary servitude, as nearly as I can understand it, runs somewhat as follows: Economic pressure, the necessity for earning a livelihood, compels the members of the union to work for the telephone company; this compulsion does not amount to involuntary servitude as long as they freely bargain with the employer on wages and conditions of work; but when the bargaining process is superseded by compulsory arbitration, their employment becomes servitude. What preserves the employee's liberty under the constitution is not collective bargaining but is the right of the individual to refuse to work for the telephone company. The rights secured by the constitution are secured to individuals *Page 791 
and not to classes. The union is the collective bargaining agent of 12,000 employees of the company, under appointment by a majority of the employees in the bargaining unit. In the ordinary course, a committee of the union agrees with the company on wages and, I suppose, this agreement is ratified by a majority of the union members. But in any group so large as this, there must be many who do not want the union to be their bargaining agent and many others who, while willing to be so represented, are dissatisfied with the stipulated wage scale. The constitutional rights of such individuals are as precious as the rights of the majority. If the argument of the union were sound, then this minority would be condemned to involuntary servitude when wages were fixed by the collective bargaining process. But I say again, their constitutional right is preserved because they can surrender their employment.
The union also objects to that provision of the statute forbidding strikes in certain cases. A large part of the argument was devoted to the thesis that picketing is protected by the constitutional guaranty of freedom of speech. The statute, however, does not interfere with picketing. It is well established that just as there can be a strike without picketing, there can be picketing without a strike. Feller v. Local 144,c., 129 N.J. Eq. 421. I disregard so much of the argument as relates to picketing.
The union next argues that whatever is lawful for one man to do, is lawful for several to do in concert; individual employees may quit their jobs at pleasure, therefore they may "strike" in concert. The major premise is generally true in the absence of legislation to the contrary; but it is not true when the legislature, acting within the wide range of its powers, prohibits such concerted action. A strike is a concerted cessation of work, intended to disrupt the business of the employer, and thereby induce him to act in a manner desired by the strikers. It has, and is intended to have, an entirely different effect from that produced by individuals acting independently, who resign their employment. The State does not have to ignore this difference. It can properly forbid such concert of action when the effect would be to disrupt essential services of a public utility, especially where *Page 792 
it is found by the Governor that the cessation of operations will seriously injure the public interest. The union suggests that there is an inherent or constitutional right to strike, a right beyond the reach of the State. I know of no such right when the strike will cause great injury to the public. In my opinion, the adoption of the union's view in this respect might lead to national disaster.
I have said nothing of the employees of the telephone company becoming employees of the State when the State seized the facilities of the company. They did not become employees of the State in any ordinary sense, but only in the peculiar or figurative sense intended by the statute. The power of the State to prohibit a strike which will disrupt the operations of aquasi-public corporation exercised for the public good does not depend on the State's being the employer; it is a phase of the police power, springing from a necessity to protect the general public. The power of the State would be no greater if title to the utility plant was in the State and the employees were paid out of tax money.
The statute and the action of the Governor pursuant thereto, do not, in my opinion, violate any provision of our Constitution or the Constitution of the United States. Of course, I limit this conclusion to the questions which have been argued before me and which I have discussed. I do not consider whether, in the application of the statute to other situations, a different conclusion might not be reached.