CHARLINE RIDER, Appellant, v. VANCE JULIAN, Chairman, Missouri State Board of Mediation, Jefferson City, Missouri, and KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, Kansas City, Missouri, Respondents, No. 43330—282 S. W. (2d) 484.

Court en Banc, September 12, 1955.
Rehearing Denied, October 10, 1955.

*Thomas C. Swanson, James Daleo, Roy P. Swanson, George H. Gangwere* and *Richard G. Poland* for appellant.

*John M. Dalton,* Attorney General, and *Robert F. Sevier,* Assistant Attorney General, for respondent Vance Julian.

316

*Charles L. Carr* for respondent Kansas City Public Service Commission.

324

*Swofford, Schroeder & Shankland, Homer A. Cope, Sprinkle, Knowles & Carter, Rogers, Field & Gentry* and *O'Sullivan & Killiger* amici curiae.

*Roy P. Swanson* and *George H. Gangwere* amici curiae; *Richard G. Poland* of counsel.

326

*Powell C. Groner,* pro se; *John H. Hendren* of counsel.

[487] STORCKMAN, J.—This is a suit to recover damages in the sum of $15,000 for personal injuries alleged to have been sustained by

the plaintiff on November 14, 1950 in Kansas City due to the negligence of the operator of a motorbus upon which she was a fare-paying passenger. The trial court dismissed the plaintiff's action and she appealed. The amount involved vests this court with jurisdiction. Section 3, Article V, Constitution of Missouri 1945.

In 1949, as it had been for years, the Kansas City Public Service Company was engaged in the operation of the mass transit system in Kansas City and adjoining portions of the State of Kansas. Its collective bargaining agreement with its operating employees was scheduled to expire on December 31, 1949. The company and union representatives negotiated but failed to agree upon a new contract. Shortly before the contract termination date the State Board of Mediation took jurisdiction and the company and its employees continued to operate the transit system. A public hearing panel was established, hearings were had, and on March 25, 1950, the panel handed down its report which, among other things, recommended a reduction of five cents per hour in the employees' rate of pay. The transit company notified the union representing the employees that if a settlement could not be reached by May 1st the company proposed to put into effect the wage reduction as recommended by the hearing panel. An agreement was not reached and a work stoppage was definitely threatened. On April 29, 1950, the day before the proposed wage reduction was to become effective, the governor of Missouri issued a proclamation and two executive orders invoking the provisions of what is commonly known as the King-Thompson Act. This act, Laws of Mo. 1947, Vol. 1, p. 358, is chapter 295 of the Revised Statutes of Missouri 1949, §§ 295.010 through 295.210, V.A.M.S. By his Executive Order No. II the governor authorized and directed Vance Julian, Chairman of the State Board of Mediation, to take possession of all or such parts of the plants, offices, facilities and equipment of the Kansas City Public Service Company as may be necessary to insure the operation of the utility in the public interest. Mr. Julian acted pursuant to the appointment, and the transit system continued to operate. The governor's proclamation and excutive orders remained in effect until December 11, 1950, at which time the transit company and its employees agreed upon a new contract. It is during this period that the plaintiff claims to have been injured.

The plaintiff's suit was directed against "Vance Julian, Chairman, Missouri State Board of Mediation, Jefferson City, Missouri, and Kansas City Public Service Company, a Corporation, Kansas City, Missouri, Defendants." The defendant Vance Julian will herein sometimes be referred to as Julian and the defendant Kansas City Public Service Company as the company or the transit company. In the alternative, the plaintiff alleged either (1) that Julian was the operator and manager of the transit company on the date of the injury, or (2) [488] that Julian was not such manager or in control of the trans-

portation facilities but that the transit company "was in sole and complete control and management of its facilities," or (3) that both Julian and the transit company "were in control and operation of the defendant public service company's transportation facilities"; and that she does not know which alternative is true.

The transit company filed its separate answer denying liability because, among other reasons, the casualty occurred at a time when the governor of Missouri had taken "possession of the plant, officers, equipment and facilities of this defendant for use and operation by the State of Missouri in the public interest" under § 19 of the King-Thompson Act, and that at the time of the casualty Julian, pursuant to the governor's orders, and not the transit company, was in full possession and control of transit company's property and was operating the public utility business, and that the operator of the motorbus was not "at said time and place employed by this defendant or acting for or on behalf of this defendant within any scope of employment of this defendant, or in any capacity for this defendant."

Defendant Julian filed his separate motion to dismiss as to him. Among other things, he alleged that if he operated or possessed the property of the transit company he did so for the sole purpose of securing the continued operation of the property in the public interest, health and welfare pursuant to the proclamation and executive orders of the governor, and that for all other purposes at all times mentioned in plaintiff's petition, the transit company was operating streetcars and motorbusses in Kansas City for the transportation of persons for hire and was in sole and complete control and management of its facilities and business; and that the defendant transit company "was the master of the operator of the motorbus mentioned in plaintiff's petition and was liable as such for any negligence, if any, as alleged in plaintiff's petition." Further, Julian alleged that if he did operate and manage the property he was acting on behalf of the State of Missouri which had not consented to be sued.

Pursuant to the motion of defendant transit company there was a separate trial of the issues as to whether the transit company or Julian and the State of Missouri was operating the bus in question, and whether or not the operator and driver of said bus was the employee of the transit company or the employee of said Vance Julian and the State of Missouri. The hearing on the issues was without a jury and the trial court found that the motorbus involved in the accident was in the exclusive possession, control and operation of the State of Missouri acting by and through its state agent and representative, Vance Julian. The judgment was that both defendants, the transit company and Julian, be "dismissed with prejudice."

The primary question involved is whether the employer-employee relation existed between the motorbus driver and one or both of the defendants. Our first consideration is whether the legal status exists

by operation of law, that is, by legislative fiat, and, if not, whether the relation was in fact created assuming the statute authorized it.

Authority for the proclamation and executive orders of the governor must be found in V.A.M.S. §§ 295.180-295.210, since the authority of the executive and his representatives cannot exceed the power granted by the General Assembly. Section 295.180 provides in substance that if the effective operation of a public utility is threatened or interrupted by a lockout, strike or work stoppage, the governor is "authorized to take immediate possession of the plant, equipment or facility for the use and operation by the State of Missouri in the public interest." The governor's power and authority may be exercised through such department or agency of the government as he may designate. The section specifically provides that the properties of the utility "shall be returned to the owners thereof as soon as practicable after the settlement of said labor dispute, and it shall thereupon be the duty of such utility [489] to continue the operation of the plant facility, or equipment in accordance with its franchise and certificate of public convenience and necessity." Section 295.200 provides penalties for unlawful acts by persons, employees or representatives of the public utility designed to interfere with the operation of the utility and gives the courts power to enforce by injunction and other legal and equitable remedies any provision of the chapter or any rule or regulation prescribed by the governor. Section 295.210 contains clauses expressly preserving the constitutional privileges of an individual employee and safeguarding his right to quit his work.

The proclamation of the governor and his executive orders must all be *within* the grant of authority from the General Assembly. Likewise, acts of any representative appointed by the governor must be *within* the authority granted him by the governor. Acts in excess of the grant of power and authority would be invalid. There is no contention that either the governor or his representative Julian exceeded their authority in what was done.

The material evidence is largely documentary. The proclamation issued by the governor April 29, 1950, found that there was a threatened interruption of the operation of the Kansas City Public Service Company, a public utility, as a result of a labor dispute, and that the public interest, health and welfare were jeopardized thereby, and proclaimed that "the exercise of the authority vested in me by Section 19 of an Act of the 64th General Assembly found in Laws of Missouri, 1947, Vol. 1, pages 359 to 366, both inclusive, is necessary to insure the operation in Missouri of the Kansas City Public Service Company a public utility."

Executive Order No. 1, signed by the governor on the same day, made certain recitals and concluded with the following order: "I hereby take possession of the plants, equipment and all facilities of the Kansas City Public Service Company, located in the State of

Missouri, for the use and operation by the State of Missouri in the public interest, effective at 11:00 P.M., Sunday, April 30, 1950."

The proclamation and Executive Order No. 1 had to do with taking *possession* of the utility property under the King-Thompson Act. Executive Order No. II, Julian's letter of April 29, 1950, and subsequent events had to do with the manner and method by which the utility was operated and the extent to which Julian used the powers granted to him.

The governor's Executive Order No. II, also dated April 29, 1950, after certain recitals, stated:

"(1) That *Vance Julian,*[1] Chairman of the State Board of Mediation, *is hereby authorized and directed to take possession* of the plants, offices, facilities and equipment of every nature and description used in the operation of the business of the Kansas City Public Service Company in the State of Missouri or such parts of each of said plants, offices, facilities and equipment *to the extent that it may be necessary* for the purpose of carrying out the provisions of this Order, which is *to insure that the said utility above mentioned is effectively operated* in the interest of the people of this state in order that they may have the benefit of necessary and essential public passenger transportation.

"(2) That Vance Julian, Chairman of the State Board of Mediation, is further authorized and directed to take possession of any and all real and personal property or any other assets wherever the same may be situated which are used or shall be necessary to be used in connection with the operation of such plants, offices, facilities and equipment and to operate *and arrange for the operation* of such plants, offices, facilities and equipment [490] *in any manner necessary in order to maintain public passenger transportation* for the people of the State of Missouri and in order that the public interest may not be interfered with.

"(3) For the purpose of carrying out the processes[2] of this Order, that Vance Julian, Chairman of the State Board of Mediation, is authorized to select and hire such employees and agents as may be necessary and suitable to carry out the same; to exercise any contractual or any other rights of the owners of said plants, offices, facilities and equipment; to do any and all other things that may be necessary or desirable for or incidental to the use and operation of said plants, offices, facilities and equipment in order to effectively operate the same in the public interest and to take any and all other steps that may be necessary to carry out the provisions of this Order.

---

[1] Italics in quotations at this point and elsewhere in this opinion have been supplied unless otherwise indicated.

[2] The word "processes" as used here and elsewhere in this order and Julian's letter of April 29, 1950, probably should be read as "purposes."

"(4) That Vance Julian, Chairman of the State Board of Mediation, shall operate the plants, offices, facilities and equipment mentioned herein under the terms and conditions of employment in effect at the time possession thereof is seized by him under the terms of this Order and he shall continue to operate the same until and unless otherwise directed by me.

"(5) That Vance Julian, Chairman of the State Board of Mediation, *may permit*, in his discretion and upon such terms and conditions as he deems advisable, *the management of the above public utility to continue its managerial functions* to the extent consistent with the processes of this Order.

"(6) All state agencies are directed to cooperate with Vance Julian, Chairman of the State Board of Mediation, to the fullest extent possible in carrying out the purposes of this Order.

"(7) That Vance Julian, Chairman of the State Board of Mediation, is authorized and directed to maintain the customary procedure for the adjustment of workers' grievances. He shall recognize the right of the workers to continue their membership in any labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, provided that such concerted activities do not interfere with the operation of public passenger transportation.

"(8) All rules and regulations of the aforesaid utility governing the internal management and organization of the company shall remain in force and effect throughout the term of operation by the State of Missouri."

Pursuant to the proclamation and executive orders, defendant Julian, on April 29, 1950, transmitted to Powell C. Groner, president of Kansas City Public Service Company at Kansas City, a letter reading as follows:

"I hand you herewith the Proclamation of Governor Forrest Smith, dated April 29, 1950. I also hand you a copy of Executive Orders No. 1 and II relating to the same subject matter.

"Governor Smith, by virtue of said orders will take possession of the plants, equipment and all facilities of the Kansas City Public Service Company, located in the State of Missouri, for the use and operation by the State of Missouri in the public interest, all to be effected as of 11 o'clock P.M. Sunday, April 30, 1950.

"I have been directed in Executive Order No. II to take possession of the plants, offices, facilities and equipment of every nature and description, [491] both real and personal, used in the operation of the business of the Kansas City Public Service Company in the State of Missouri, or such parts as are necessary for the purpose of carrying out the provisions of the orders of Governor Smith. I am by this letter taking this *formal step* as of 11 o'clock

P.M., Sunday, April 30, 1950. All of which is done to insure that the said utility above mentioned is effectively operated in the interest of the people of this state in order that they may have the benefit of necessary and essential public passenger transportation.

"*Paragraph 5 of Executive Order No. II gives me the power to continue the operation of the utility under the present management. This I propose to do.* Therefore, by virtue of the power given to me by the above mentioned orders, Honorable Powell C. Groner is ordered and directed to operate and manage the utility to the extent consistent with the processes of the Governor's orders. He will have the *full charge* of said utility *and all officers and employees will continue under the terms and conditions of employment at the time possession thereof is seized,* to-wit 11:00 P.M., Sunday, April 30, 1950. All wage scales and working conditions will remain the same unless otherwise directed.

"Paragraph 7 of Executive Order No. II will be in force and effect. *The company and employees will operate under the terms of the 1949 labor agreement unless same has been amended by mutual agreement.*

"All rules and regulations of the aforesaid utility governing the internal management and organization of the company shall remain in force and effect throughout the term of operation by the State of Missouri."

Additional evidence with respect to the operation of the utility will be discussed in the course of the opinion.

The two witnesses that testified, Mr. Groner and Mr. Julian, both drew conclusions both of law and fact during the course of their testimony. Self-serving statements were also made in documents and otherwise during the period of the state's seizure. For example, Mr. Groner on May 1, 1950, apparently on his own initiative and without consulting Julian, prepared and posted a bulletin in which it was stated: "Kansas City Public Service Company is no longer engaged in the operation of the transit system, and same is being operated by the State of Missouri *without liability or responsibility on the part of said company during the period of State operation.*" The bulletin also stated that "The officers, officials and employees of the company have become employees of and are working for the State of Missouri." Other such statements were made with respect to the liability for Workmen's Compensation payments and in presenting an application for an increase in fares before the Missouri Public Service Commission. These are typical of statements by transit company executives at various times during the period in question. There is no showing that the plaintiff is connected in any way with these statements, and objection was duly made at the trial. Such statements are obviously self-serving. They are not binding on the plaintiff and will not be

considered of any evidentiary value in determining the issues in this case. Wahl v. Cunningham, 332 Mo. 21, 56 S.W.2d 1052, 1059. Likewise, it binds no one that Julian considered the seizure to be a "technical" one. The statements of Mr. Groner and Mr. Julian might be of some significance if offered in connection with a controversy between the state and the transit company, but they can have no possible competency or relevancy with respect to plaintiff's claim.

■ Julian was, at the time in question, the chairman of the State Board of Mediation duly appointed pursuant to § 295.030. He was also serving as the agent or representative of the state through whom the governor exercised the power and authority [492] granted in § 295.180. Since the capacity in which he was serving was fully disclosed and acknowledged, it is not contended that he incurred any personal obligation or liability. When we refer to Julian he will be deemed to be acting in his capacity as agent or representative of the state.

■ In order for the state to acquire the status of employer with respect to the operating personnel of the utility, there must be express legislation so providing or the relation must come into existence as the result of contract or result from the application of common law principles to the facts in the case.

Since the statute does not expressly so provide, the relation of employer and employee between the state and the operating personnel of the utility did not arise by operation of law. In this instance we use the term "operation of law" to express the manner in which rights, and sometimes liabilities, devolve upon a person or persons by the application to the particular situation of express statutory provisions without any act of the party or parties. Black's Law Dictionary, 4th Ed., Operation of Law.

Merely invoking the provisions of the King-Thompson Act by the issuance of the governor's proclamation and Executive Order No. 1 without more, did not have the legal effect of converting the operating employees of the transit company into state employees. Such intent and purpose would have to be clearly expressed. The New Jersey statute for dealing with labor disputes in public utilities is similar to our own. However, it expressly provides that "during the continuance of such possession *the relationship* between the government of the State of New Jersey and the persons employed at such public utility, shall be that of employer and employee." NJSA 34:13B-19.

The General Assembly has the power to impose the status by express legislative enactment. Thus our Workmen's Compensation Act specifically creates the status of "statutory" employer and employee. V.A.M.S., § 287.040; Viselli v. Missouri Theatre Bldg. Corp., 361 Mo. 280, 234 S.W.2d 563, 567; Perrin v. American Theatrical Co., 352 Mo. 484, 178 S.W.2d 332, 334; Baker v. Iowa-Missouri Walnut Log Co., Mo. App., 270 S.W.2d 73, 75; Rucker v. Blanke Baer Extract & Preserving Co., Mo.App., 162 S.W.2d 345, 346.

334

The defendant transit company has cited a number of cases which arose under the World War I Railroad Seizure Act, in support of its contention that "taking possession" in and of itself relieves the transit company of liability. These authorities are not helpful in the present situation because of the difference in statutory provisions and executive orders. This distinction is made apparent in the case of Mo. Pac. R. Co. v. Ault, 256 U.S. 554, 41 S.Ct. 593, where, by the express provisions of the Federal Act, the new managers were required to completely sever their relations with the railroad companies, the employees were controlled by the federal administrator and not by the company, a remedy was provided in lieu of the carrier's liability and the government got the profits or was charged with the loss resulting from operations.

We will not imply from the statute an intention to make the utility personnel state employees by legislative edict unless such intent is clearly expressed. See State ex rel. Buder v. Hackmann, 305 Mo. 342, 265 S.W. 532, 534, wherein a statutory provision for payment of the necessary expenses of the assessor and his deputies was held to "fall far short of constituting clear and satisfactory authority for the payment by the state of clerk hire for assessors." The act not only fails to provide expressly and with clarity that the operating personnel of a utility shall, by operation of law, become state employees, but also wholly fails to make any provision fairly susceptible of such a construction.

■ The proclamation and Executive Order No. 1 made no provision with regard to the use or operation of the utility property. [493] It is from Executive Order No. II, Julian's instructions to Groner, and the activities of Julian and Groner thereafter that we must determine who was legally liable for torts resulting from the *operations* of the utility at the time plaintiff claims to have been injured.

By Executive Order No. II Julian was authorized to take possession of the utility property or such parts thereof as might be necessary "to insure that said utility above mentioned is effectively operated in the interest of the people of this state." By § 2 of the order he was authorized "to operate and *arrange for the operation*" of the utility. By paragraph 3 Julian "is authorized to select and hire such employees and agents as may be necessary and suitable to carry out" the provisions of the order. By § 5 Julian in his discretion was authorized to permit "the management of the above public utility *to continue its managerial functions* to the extent consistent with the" purposes of the order.

In transmitting the proclamation and executive orders to Mr. Groner, president of Kansas City Public Service Company, Julian specifically stated that he proposed "to continue the operation of the utility under the present management" and that Mr. Groner "will

have *full charge of said utility* and all officers and *employees will continue under the terms and conditions of employment at the time possession thereof was seized."* Other than contacting Mr. Groner as stated, there is nothing in the record tending to show that Julian undertook to hire or take over the employment of any of the operating personnel of the utility. It is apparent from an examination of the proclamation and the executive orders in their entirety that Julian did not use to the fullest extent the powers granted him which we will assume without deciding were valid grants of authority.

· We are presently interested in determining whether Julian entered into any hiring or contract of employment with the operating personnel of the utility on behalf of the state. State employment, while it must be authorized by law, generally has its basis in contract, express or implied, the same as any other hiring. 67 C.J.S. 114, Officers, § 5(4) states that "* * * an employment, although it may be created by law, usually arises out of a contract between the government and the employee; * * *."

This court has adopted the definitions of master and servant found in § 2, Restatement of the Law of Agency. Smith v. Fine, 351 Mo. 1179, 175 S.W.2d 761, 765; Mattan v. Hoover Co., 350 Mo. 506, 166 S.W.2d 557, 564. Section 2 of the Restatement defines a master as follows: "A master is a principal who employs another to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service." A servant is "a person employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master." The record is devoid of any evidence that Julian controlled or had the right to control the physical conduct of the operating employees of the utility.

None of the utility employees were paid by the state. This is a strong factor indicating that they were not state employees. Williams v. Gideon-Anderson Lumber Co., Mo.App., 224 S.W. 51, 53. In 81 C.J.S. 973, States, § 53, with reference to state employees, it is stated: "Payment of particular persons by the state is a very strong circumstance showing that they are state employees, and it has been held that one becomes a civil servant or employee only when he furnishes his services or labor for compensation directly paid to him by the state. * * * An independent contractor, working for the state, has been held not 'an employee of the state.'" Under the evidence, we must hold that there was no contract of employment, either express or implied, between Julian on behalf of the state and the operating personnel of the utility.

· The question then arises whether the state, through its representative, Julian, [494] exercised such control over the physical operation of the utility as to impose a liability for the acts of the operating personnel of the utility under principles of common law.

Mr. Julian testified that he did not participate in the management of the company and had no intention of doing so; that all of his instructions were given to Mr. Groner in two letters, one written at the time he delivered the proclamation and executive orders, and the other written in connection with the payment of Workmen's Compensation claims; nor was there any showing that Mr. Julian actively participated in the management of the utility. Apparently the only time Julian was consulted was when the transit company was seeking something for its own advantage. On these occasions Groner and the other executives must be held to be acting in their capacity as corporate officials and not as representatives of the state.

■ The "plant, equipment or facility" which the statute authorized the governor to take from the possession of the utility was its physical property. Tucker v. St. Louis-San Francisco R. Co., 298 Mo. 51, 250 S.W. 390; Canary Taxicab Co. v. Terminal Ry. Assn. of St. Louis, 316 Mo. 709, 294 S.W. 88. The act did not purport to authorize the governor to command the services of the personnel of the utility, whether it be the president of the company or the operator of one of its busses.

■ The governor's Executive Order No. II was not a mandate for Julian to operate the property personally, and the evidence shows that he did not do so. Paragraph 5 of Executive Order No. II authorized Julian to permit the existing management to continue its functions, and his letter of April 29, 1950 shows that this is what he did. The management of the transit company continued to act as a unit and Julian did not disturb its employment relations.

Whether the company established a relation of independent contractor with the state is not necessary for decision in this case. However, the relation is clearly akin to it. In § 2, Restatement of the Law of Agency, an independent contractor is defined as "A person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." Was the transit company subject to Julian's right to control with respect to its "physical conduct in the performance of the undertaking"? We do not think so on the facts of this case.

■ The briefs in this case discuss at great length the kind and extent or degree of possession taken by the state pursuant to the King-Thompson Act. Possession alone is not determinative of the issue of liability. Our inquiry is who was the master of the driver of the motorbus in question, and we need not determine precisely the kind or extent of the state's possession except as it affects our primary question. It is aptly stated in 73 C.J.S. 196, Property, § 14, "Both in common speech and in legal terminology, there is no word more ambiguous in its meaning than 'possession' when considered in its relation to property."

Actual possession, or, as it is sometimes called, pedis possessio, has been defined by the Missouri courts as "real" and "visible" and as " 'actual and continuous occupancy or exercise of full dominion.' " Jackson v. Rothschild, Mo.App., 99 S.W.2d 859, 861; Bradbury Marble Co. v. Laclede Gaslight Co., 128 Mo.App. 96, 106 S. W. 594, 599; Crain v. Peterman, 200 Mo. 295, 98 S.W. 600. The possession which Julian assumed was largely declaratory in nature. It was proclaimed by the governor and again by Julian in his letter to Mr. Groner, but actually nothing was done about it. No one was dispossessed and everyone stayed on his accustomed job. The state's possession was not real or visible, nor was the transit company ousted from its "actual and continuous occupancy or exercise of full dominion" over its premises. Not only did the company retain the occupancy of its physical property, but the revenue was received and retained as it had always been and was used for operating expenses, improvements, [495] relocating tracks, and even the purchase of additional equipment to the extent of between $300,000 and $400,000.

It is apparent from the record, and we so hold, that possession of Julian and the state was not intended to be and was not in fact actual possession. Insofar as the possession needs to be identified by name, it might be called a legal possession or a nominal and technical possession. It was more or less the assertion of the right to possession which did not, in this case, ripen into exclusive or actual possession.

That the right of use and possession is not conclusive as to liability is shown by the case of Bibb's Adm'r. v. Norfolk & W. R. Co., 87 Va. 711, 14 S.E. 163. In this case the railroad company contracted for repairs to one of its bridges. The company reserved the right to continue to use the bridge and to inspect the work as it proceeded. While so using the bridge, an accident occurred through no active negligence of the company, and an employee of the bridge contractor was injured. It was held that this was not such possession or control as to impose liability upon the railroad company. The mere retention by the one in possession of the right to inspect the work of an independent contractor as it progresses for the purpose of determining whether it is completed in accordance with the contract does not create the relation of master and servant with those engaged in the work. Salmon v. Kansas City, 241 Mo. 14, 145 S.W. 16, 20-21; Williamson v. Southwestern Bell Tel. Co., Mo., 265 S.W.2d 354, 359.

It cannot be said that the state retained any right to control with respect to the "physical conduct in the performance of the undertaking." Julian designated the "present management" to continue the operation of the utility. Although his contacts were with the president of the company, it would be straining the situation unduly to say that Groner was "the management." Obviously the transit company remained in control as the managers of the utility business. So far as the record shows, Julian did not even retain control of policy-

making matters. He was not consulted with respect to improvements made or new equipment purchased, some of which was quite substantial.

Where the statute does not expressly so provide and participation in operations has been limited as here, the courts have held that government did not incur liability by asserting the right to seize property of the utility and to have "nominal" or "technical" possession. In Marion & Rye Valley Ry. Co. v. United States, 270 U.S. 280, 46 S.Ct. 253, 255, the railway company made its claim for the alleged taking of possession and use of the railroad by the United States under the Federal Control Act. The court held that even if there was a technical taking that the company had remained in actual possession of its property and there could be no recovery.

In the case of Stanton v. Ruthbell Coal Co., 127 W.Va. 685, 34 S.E.2d 257, the action was for the wrongful death of a coal miner. The defendant coal company asserted that the government of the United States under an executive order issued by the President of the United States was, on August 27, 1943, decedent's employer and in complete possession and control of the mine and its operation and therefore defendant was under no liability whatsoever. The President's order provided that the secretary of the interior shall take over such control of coal mines as he may deem necessary to accomplish the maintenance of full production of coal for the effective prosecution of the war. The Supreme Court of Appeals of West Virginia held that the regulations "clearly indicate that, except and only if necessary to effect the primary object of Government control, such control would be nominal." The court pointed out that the control of the mines was wholly unlike the control of the railroads, since in the latter case the director general had been made liable for damages resulting from the negligent operation [496] of the railroads and the carriers themselves had been relieved. A petition for review by the Supreme Court of the United States on certiorari was denied (326 U.S. 740, 66 S.Ct. 53). The Stanton case is quite similar on the essential facts and the applicable principles to the case at bar. In the case of State v. Traffic Tel. Workers Fed., 142 N.J.Eq. 792, 61 A.2d 570, 573, the seizure was referred to as a "protective custodianship" in a situation where the seizure was comparable to the one in the case at bar.

Under the facts of this case the state did not incur any liability to persons injured as a result of operations during the seizure of the utility, and it follows that Julian's motion to dismiss was properly ruled.

Our next subject of inquiry is whether the transit company remained liable for the torts of the utility personnel after April 29, 1950, as it had been before. None of the state's funds were used in the operation of the utility between May 1 and December 11, 1950. Mr. Julian did not seize any of the company's money nor its bank

account; nor did he collect any of the current income during this period or sign any checks. The payment of the operating employees out of funds which belonged to the company, or which were treated as its own, was a circumstance tending to prove the utility personnel were employees of the company during this period of time. Menard v. Goltra, 328 Mo. 368, 40 S.W.2d 1053, 1058. After eliminating self-serving declarations and conclusions from the record, there is no competent evidence that the employer-employee relationship between the transit company and its employees was severed on April 29, 1950, and we hold that the relation continued to exist during the period in question and that at the time of plaintiff's alleged injury the transit company was the employer and master of the operator of the motorbus in question.

 The defendant company would also be liable on the theory of ratification for tortious acts of the operating personnel of the utility. The defendant company received and retained the revenue derived from the carriage of passengers during the period in question. Although Mr. Groner mentioned an accounting, it was never made. The company's acceptance and retention of the fares of passengers under the circumstances amounts to a ratification that establishes the relationship of master and servant in such a way and in such a character that the company must be held responsible for any negligence of the operator of the motorbus. In the case of Dempsey v. Chambers, 154 Mass. 330, 28 N.E. 279, the plaintiff ordered coal from the defendant. The coal was delivered by one who was not defendant's servant, and in doing so he broke a plate glass window of the plaintiff. After the delivery of the coal, and with knowledge that the person who delivered the coal had broken the window, the defendant demanded that the plaintiff pay for the coal. It was held that there was a ratification which made the deliverer of the coal the agent and servant of the defendant for the delivery of the coal, and that the defendant became responsible for his negligence in that regard. The opinion by Judge Oliver Wendell Holmes, Jr. stated, 28 N.E. l.c. 280, 281:

"We have found hardly anything in the books dealing with the precise case, but we are of opinion that consistency with the whole course of authority requires us to hold that the defendant's ratification of the employment established the relation of master and servant from the beginning, with all its incidents, including the anomalous liability for his negligent acts. See Coomes v. Houghton, 102 Mass. 211, 213, 214; Cooley, Torts, 128, 129. The ratification goes to the relation, and establishes it ab initio. The relation existing, the master is answerable for torts which he has not ratified specifically, just as he is for those which he has not commanded, and as he may be for those which he has expressly forbidden."

[497] The case of Lamb v. Davidson, 69 Mo.App. 107, recognized the principle of ratification. In that case the tortious act consisted of the detention by defendant's daughter and nephew of plaintiff's cattle which had strayed into defendant's pasture. The original detention had been without defendant's knowledge. The opinion states, l.c. 114, "* * * if they were not acting for him, nor as his servants, he after being notified by Lamb of what had been done, ratified the act (of which there is some evidence in the record) he is responsible."

The principle of ratification under these circumstances is well established in common law. In 35 Am. Jur. 997, Master and Servant, § 563, it is stated: "Where one assumes without authority to act as the agent of another, the latter's ratification of the transaction relates back and establishes the relation of employer and employee with all of its incidents including the employer's liability for the employee's wrongful acts and omissions."

Whether there were net profits during the period the record does not show, but it does not matter. The company did receive and retain the income derived from the operation of the utility during the period in question, and that is sufficient to support a ratification.

Neither of the defendants have questioned the constitutionality of the King-Thompson Act. The amici curiae have no right to question the act's constitutionality although they have undertaken to do so. Laret Investment Co. v. Dickmann, 345 Mo. 449, 134 S.W.2d 65. The plaintiff first raised the question of the act's constitutionality in her reply. This has been held too late. Nemours v. City of Clayton, 351 Mo. 317, 172 S.W.2d 937. Even though the question were timely raised by plaintiff, it would not be necessary to rule the constitutional questions because their determination is not essential to the proper decision of the case presented. State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75; Kansas City v. Tiernan, 356 Mo. 138, 202 S.W.2d 20.

For the reasons given, the judgment of the trial court dismissing the case as to the defendant Vance Julian, Chairman, Missouri State Board of Mediation, is affirmed.

The judgment dismissing the defendant Kansas City Public Service Company, a Corporation, is reversed and the cause is remanded.

*Leedy, C.J., Dalton, Hollingsworth, Hyde, Westhues, JJ.,* and *Stone,* Special Judge, concur; *Eager, J.,* not sitting.